[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On March 26, 1999, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of the mother and father of Paulay W., born November 16, 1998, who has been in foster care since birth. On December 8, 1999, this court proceeded to trial on the petition. Both parents were represented by counsel. Mother, Fayita W., attended the trial, but Father, Paul I., did not. At the trial, DCF offered the testimony of two social workers, Kathleen Hustek and Sandra Knowlton, and submitted the social study into evidence. The parents and the child's attorney presented no testimony and submitted no evidence.
The petition, as amended on September 30, 1999, alleges two CT Page 518 statutory grounds for termination of parental rights. General Statutes § 17a-112 (c), in pertinent part, provides for termination if "(A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child;" and "(B) the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child.
Termination of parental rights proceeds in two stages: adjudication and disposition. In the adjudicatory phase, the court must determine whether the proof provides clear and convincing evidence that any one of the grounds pleaded exists to terminate parental rights as of the date of the filing of the petition or last amendment. In re Joshua Z., 26 Conn. App. 58,63, 597 A.2d 842 (1991), cert. denied 221 Conn. 901 (1992). If at least one pleaded ground to terminate is found, the court must then consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest. Procedurally, the evidence as to both issues is heard at the same trial without first "determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. State v.Anonymous, 179 Conn. 155, 172-173, 425 A.2d 939 (1979); In re
Juvenile Appeal (84-BC), 194 Conn. 252, 258, 479 A.2d 1204
(1984); In re Nicolina T., 9 Conn. App. 598,602, 520 A.2d 639, cert. denied, 203 Conn. 804,525 A.2d 519 (1987); In re EmmanuelM., 43 Conn. Sup. 108, 113, 648 A.2d 904, cert. denied231 Conn. 915, 648 A.2d 151 (1994).
 I FACTUAL FINDINGS
The credible and relevant evidence offered at trial, supports the finding of the following facts:
On November 24, 1998, a petition alleging that Paulay, a newborn at Hartford Hospital, would be neglected and uncared for CT Page 519 if discharged to the custody of her parents was filed by DCF, along with a motion for an order of temporary custody, which was granted. After birth, Paulay was experiencing withdrawal symptoms and had to be treated for exposure in utero to Fayita's methadone usage and confirmed sexually transmitted disease. At the OTC hearing on December 4, 1998, both parents were present. Preliminary specific steps were issued by the court on November 24, 1998 and December 4, 1998, which stressed the need for both parents to attend drug treatment programs; Fayita was urged to enter an inpatient program. Subsequent to the OTC hearing, the parents stopped cooperating with DCF and their attorneys. On March 2, 1999, after a trial neither parent bothered to attend, Paulay was adjudicated neglected and uncared for and committed to DCF for a period not to exceed twelve months. On this date, attorneys for the parents indicated to the court that they had lost contact with their clients. After the court was informed that neither parent had visited Paulay since December 11, 1998, the court urged DCF to file a termination petition.[1]
 A. Mother, Fayita W.
Fayita W., one of 6 children, was born on May 30, 1975 in Hartford, Connecticut. She attended high school until the tenth grade and has never held stable employment for any significant period of time. She has admitted to a heroin and cocaine addiction of over eight years in duration. At times, she has used as much as fifteen bags of heroin a day and has had to resort to prostitution to support her habit. She has a criminal history that includes charges of prostitution and drug possession.
In August of 1997, Fayita was incarcerated and her two older children were placed in foster care and subsequently committed to DCF. Expectations were set by the court advising Fayita what she had to do to regain their custody. Consequently, for over a year prior to Paulay's birth, DCF had offered Fayita multiple opportunities to address her substance abuse. In June, 1998, social worker Kathy Hustek and Fayita met with Julie Sinkiewicz, a substance abuse specialist, to discuss drug treatment options. Fayita was referred and admitted to Hogar Crea , but left within a few days. Although she attended the Hartford Dispensary for methadone treatment, her attendance was not consistent and she tested positive for cocaine usage in October, 1998. After Paulay's birth, the Lifeline Program at the Wheeler Clinic worked with the Morris Foundation and arranged an inpatient treatment option for Fayita that allowed her to have Paulay join her in CT Page 520 residence at the facility once Fayita was stabilized. A date was arranged for the Morris Foundation to pick Fayita up and transport her to this program. Fayita did not show up. The Lifeline program subsequently discharged her for noncompliance.
Paulay was born suffering from methadone withdrawal. She also required prophylactic treatment for a possible venereal infection. She required intensive care and a longer hospital stay than normal for a newborn. The first week Paulay was hospitalized, Fayita visited her daily. After the first week, she did not visit as often. After Paulay was discharged to a foster home on December 19, 1998, Fayita did not contact DCF to request visits. Although Hustek was on medical leave for half of December, 1998, and most of January, 1999, Fayita could have requested visits by speaking with Hustek's supervisor, and Hustek's clients were routinely referred to her supervisor during that period. However, there is no record of any calls from Fayita to DCF during Hustek's leave. Hustek remained on the case until May 24, 1999. By the end of January, 1999, Fayita's last known phone number had been disconnected and her whereabouts were unknown. Her extended family told Hustek that they had no knowledge of her address. Fayita failed to attend four court hearings affecting her children between January and April of 1999.
On May 7, 1999, Fayita was incarcerated again. On July 2, 1999, she was released to the Fresh Start Program in Hartford, a residential substance abuse treatment program and halfway house. On July 7, 1999, Fayita called social worker Sandra Knowlton, the new treatment worker, and asked for visits with her three children. (She had seen her other two children once in the past year.) On July 27, 1999, Knowlton and Warner agreed that DCF would consider scheduling visits if Fayita completed the Fresh Start Program. However, Fayita left the program permanently on August 12, 1999 and did not contact Knowlton. On October 5, 1999, Knowlton contacted Fresh Start and learned of Fayita's premature discharge. Knowlton then contacted Fayita to encourage her to reenter Fresh Start, but Fayita claimed she was now in an outpatient drug treatment program. Knowlton set up a meeting with Fayita at the DCF office for October 6, 1999, but Fayita failed to attend. Knowlton did not hear from Fayita again until November 10, 1999, when she learned from Ruth Buban, a counselor at York Correctional Institution, that Fayita was again incarcerated for violating her probation. Her anticipated release date is September 3, 2000. CT Page 521
 B. Father, Paul I.
Not much is known about the background of Paulay's male biological parent, Paul I. He may have visited with his daughter subsequent to her birth and prior to her discharge from the hospital, and he attended the preliminary hearing held on December 4, 1998, subsequent to the court's issuance of an order of temporary custody. He also signed a formal paternity acknowledgment for Paulay on January 4, 1999. Subsequently, however, he failed to maintain contact with his attorney or DCF, his telephone was disconnected, and he did not respond to correspondence from DCF. Early on in the case, he did attend a substance abuse assessment evaluation at ADRC, and tested positive for cocaine usage. However, he did not return to follow treatment recommendations. He has not requested any visits with Paulay and has sent her no cards, gifts or letters. He has not contacted DCF since December 11, 1998 to inquire as to his child's well-being. He also has failed to cooperate with his attorney and provided her with an erroneous address. His did not attend most of the scheduled court hearings affecting Paulay since December of 1998. There is no evidence he has contributed any financial support for his daughter. At the present time, his whereabouts are unknown.
 C. Child, Paulay W.
Paulay is now a year old and has been residing with the same foster family since her discharge from the hospital on December 11, 1998. She is a biracial child and is presently on target developmentally. When first discharged, she required swaddling, rocking and continuous holding which were necessary because methadone withdrawal left her highly irritable and easily jarred. She no longer requires this special handling, and is thriving except for frequent fevers and colds. She has bonded with her foster parents, who wish to adopt her, and calls them "mama" and "dada." The foster siblings treat her like a sister.
 II ADJUDICATION
Each statutory basis set out in General Statutes § 17a-112(c) is an independent ground for termination. In re Baby Girl B.,224 Conn. 263, 618 A.2d 1 (1992). The petitioner is required to prove CT Page 522 one or more of the three grounds alleged in its petitions by clear and convincing evidence.
A. Abandonment — General Statutes § 17a-112 (c)(A).
This ground is established when the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child.
Fayita's and Paul's demonstrated level of commitment and responsibility toward Paulay has been substandard, to say the least. Within a few weeks after her birth, they demonstrated no interest in visiting her. There is no evidence that they contributed support for Paulay since her initial placement in December of 1998, and neither of them sent her any cards, gifts or letters. They did not maintain consistent, regular contact with the foster home or DCF to inquire as to their daughter's well-being.
Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of "interest, concern or responsibility." In re Migdalia M.,6 Conn. App. 194, 209, 504 A.2d 533 (1986).
 "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child' (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted." In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122
(1993); In re Roshawn R., 51 Conn. App. 44, 53, ___ A.2d ___ (1998).
Fayita and Paul have fallen far short of the above standard.
Statutory abandonment on the part of the parents has been proven by clear and convincing evidence. They have not manifested a consistent, prolonged and reasonable degree of interest, concern or responsibility as to Paulay's welfare. In re Rayna M.,13 Conn. App. 23, 37-38, 534 A.2d 897 (1987); In re Michael M.,29 Conn. App. 112, 121-123, 614 A.2d 832 (1992). CT Page 523
B. Failure to Rehabilitate — General Statutes § 17a-112 (c)(B).
If the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding fails to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child, grounds for termination exist.
Personal rehabilitation, as used in the statute, refers to the restoration of the parent to a constructive and useful role as a parent. In re Mindalia M., 6 Conn. App. 194, 203, 504 A.2d 532
(1986).
Whether the age and needs of the child do not support allowance of further time for the parent to rehabilitate must also be considered. In re Lius C., 210 Conn. 157, 167, 554 A.2d 722
(1989). Also, in determining whether further allowance of a reasonable period of time would promote rehabilitation, a court can consider efforts made since the date of the filing of the petition to terminate parental rights. In re Sarah M.,19 Conn. App. 371, 377, 562 A.2d 566 (1989).
The evidence is clear and convincing that Paulay was adjudicated neglected and uncared for and committed to DCF on March 2, 1999. When the court sustained the order of temporary custody to DCF on December 4, 1998, both parents were present and were appointed counsel at state expense. Preliminary specific steps suggesting what each parent needed to do to regain custody of their daughter were signed by the judge who granted the ex parte temporary custody order. The preliminary steps required that both parents keep all appointments with DCF and cooperate with home visits. They were to keep their whereabouts known to DCF and their attorneys, visit the child as often as permitted, participate in parenting and individual counseling, cooperate with in home support services referred by DCF, sign releases to monitor their progress with services, secure and maintain adequate housing and legal income, and not engage in any substance abuse or criminal behavior. At the preliminary hearing on the order of temporary custody, and on the date of the commitment, March 2, 1999, the court again ordered specific steps almost identical to those outlined above. A parent's compliance with specific steps or the parent's success in fulfilling service agreements entered into with DCF, although not dispositive, is CT Page 524 relevant to the rehabilitation finding. In re Luis C., supra,210 Conn. 167-168. The ultimate question is whether the parent at the time of the filing of the termination petition is more able to resume the responsibilities of parenting than she was at the time of the commitment. In re Michael M., supra, 29 Conn. App. 126. In this case, since there has been almost no compliance with specific steps, the answer to that question is a resounding "no."
The evidence in this case is clear and convincing that Fayita and Paul, as of the date of the last amendment to the termination petition, September 30, 1999, had not achieved a reasonable degree of rehabilitation, and there is no evidence of conduct prior or subsequent to that date which would encourage the belief that within a reasonable period of time, considering the ages and needs of Paulay, they could assume a responsible position in her life. Neither parent has fulfilled crucial components of the specific steps recommended by the court. Both prior and subsequent to the DCF assuming custody of Paulay, DCF offered appropriate and timely services to both parents. It was made abundantly clear to Fayita that the first essential step was the completion of an inpatient treatment program. In the thirteen months prior to Paulay's birth, Hustek had made several attempts to have Fayita enter such a program. She was referred to Coventry House and Hogar Crea. Immediately subsequent to Paulay's birth, Fayita failed to appear to be transported to a bed secured by the Lifeline Program and the Morris Foundation. Paul was referred to and attended a substance abuse assessment and screen at ADRC, where he tested positive for cocaine. He did not follow through with recommendations for treatment. DCF also provided the parents with a visitation schedule and medical and foster care for Paulay. Both parents were asked if they desired DCF to investigate any relative placements, but neither parent suggested anyone.
Fayita was incarcerated again in November of 1999 for violation of probation, after she dropped out of Fresh Start, another inpatient drug rehabilitation program. There is no evidence as to the nature or content of her present programs at York, if any. She will be locked up until September of this year, another nine months from now. There is nothing to persuade the court that she has conquered her past problems sufficiently or that her rehabilitation to a useful and constructive parental role for Paulay is probable in a reasonable period of time. This court cannot anticipate that incarceration will successfully rehabilitate Fayita or cause her to overcome her serious drug CT Page 525 addiction especially when it has failed to do so in the past. No concrete or realistic plan was proposed by Fayita during the trial that soon would permit the return of Paulay.
Paul has been whereabouts unknown for many months. He did not attend the trial. The address he allegedly gave to his attorney as the address of a sister with whom he was staying, 32 Colonial Street, doesn't exist. In addition, the court has been given no sign that Paul has ever addressed the problem of his addiction.
Due to the parents' lack of contact with Paulay for over a year, any proposed reunification plan would have to include the expenditure of a significant period of time, with little assurance of success, just encouraging the parents to establish a bond with Paulay.
The evidence is clear and convincing that Fayita and Paul have not achieved a status where they are more able to parent Paulay than they were at the time of her initial commitment, nor is there any evidence to conclude that rehabilitation to the roles of constructive parents could be achieved within a reasonable period of time.
The court believes further delay in this case to attempt to promote more efforts at rehabilitation on the part of the parents would be detrimental to Paulay, who has been in foster care for over a year: all of her infant life. Paulay is bonded to her foster parents and requires a safe, permanent and secure home with caretakers who can address an infant's special needs.
Failure to rehabilitate has been established by clear and convincing evidence.
 DISPOSITION
1. Section 17a-112 (e) Criteria
The court has found by clear and convincing evidence that both of the statutory grounds alleged by the petitioner for the termination of parental rights have been proven.
Before making a decision whether or not to terminate parental rights, the court must also consider and make findings on each of the seven criteria set forth in § 17a-112 (e). In re Romance M.,229 Conn. 345, 355, 641 A.2d 378 (1994). CT Page 526
These criteria and this court's findings which have been established by clear and convincing evidence, are as follows:
(1) "The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent."
DCF offered timely and appropriate services to both parents to promote reunification, which are more fully described on page 10 of this decision. In addition, DCF offered visitation arrangements and medical and foster care for Paulay.
(2) "Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended."
As noted in paragraph (1) above, DCF made reasonable efforts to reunite the family.
(3) "The terms of any court order entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties have fulfilled their expectations."
Preliminary specific steps for both parents were issued on November 24, 1998. Final steps, which were not significantly different from the preliminary ones were issued at the time of the commitment on March 2, 1999. Both parents were represented by counsel and should have been made aware of these, although they never signed them. The parents failed to maintain consistent and regular contact with DCF or their child and their lack of compliance with almost all of the specific steps is discussed in detail on pages 9 and 10 of this decision.
(4) "The feelings and emotional ties of the child with respect to his parents, any guardians of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties."
Paulay has not seen either of her parents since December of 1998, and has no parental bond with them. Paulay has spent most of her life with the same foster parents. She is very attached to them and her foster siblings. It is hoped she can be adopted by this family. CT Page 527
(5) "The age of the child."
Paulay was born on November 16, 1998 and is now almost fourteen months old. The federal Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 et. seq., as amended, mandates that after 12 months in foster care a child must have a plan for a permanent home. In re Samantha B., 45 Conn. Sup. 468, 479
___ A.2d ___ (1998). Foster care should be a strictly limited episode in the life of a child. Paulay deserves a permanent home and there is no justification for further delay.
(6) "The effort the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return to his home in the foreseeable future including but not limited to (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided that the court may give weight to incidental visitations, communications or contributions and (b) the maintenance of regular contact or communications with the guardian or other custodian of the child."
After visiting Paulay in the hospital for the first few weeks of her life, neither Fayita nor Paul made any effort to maintain regular contact or express any affection toward their daughter through visits, cards, gifts or letters, nor did they call DCF or the foster home to inquire as to her well-being. There is no evidence that the parents made any effort to change their transient lifestyle, one that appears to have been dominated by the need to nurture their drug addictions rather than their offspring. They never secured adequate housing or stable income in order to provide care for Paulay, and there is no evidence either parent has engaged in the treatment or counseling programs recommended to assist in their rehabilitation.
(7) "The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable acts or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
There is no evidence that indicates that DCF or any other person unreasonably interfered with either parent's ability to maintain a relationship with Paulay. Hustek's brief medical leave CT Page 528 was not proven detrimental, as coverage had been arranged for her cases. Fayita's and Paul's extended and unjustified absence from their baby's life is completely of their own volition.
There is no evidence that economic circumstances have constituted a significant factor in the parents' failure to maintain a meaningful relationship with her daughter. The state provided them with counsel at no expense to them throughout proceedings affecting Paulay; proceedings they attended sporadically.
2. Best Interests of the Child
The court must now address the issue of whether the termination of parental rights is in the best interest of the child. This is the dispositional phase of a termination proceeding. In reValerie D., supra, 223 Conn. 511.
As of the date of trial, Paulay had developed no relationship or bond with either of her parents. She is firmly attached and well adjusted to her foster parents, who would like to adopt her.
Few cases present such a flagrant lack of affection or responsibility towards a child as this one. No one knows where Paul is. Fayita resumed her transient and irresponsible existence with little regard for Paulay within weeks of her birth. Now she is serving a prison sentence. Neither parent has presented a concrete or viable plan for reunification within a reasonable time period, nor have they shown the court any willingness to address their serious parenting deficiencies.
Based upon the foregoing findings, the court concludes that the evidence is clear and convincing that the best interest of Paulay is served by the termination of Fayita's and Paul's parental rights so she may be freed for immediate adoption. The court notes that counsel for the child fully supports this result as being in her best interest.
 CONCLUSION
The petition is granted and judgment may enter terminating Fayita W.'s and Paul I.'s parental rights in Paulay W. Pursuant to General Statutes § 17a-112 (i), it is ordered that the commissioner of DCF be appointed statutory parent so that this little girl can be placed for adoption. The statutory parent CT Page 529 shall report to the court within sixty days on a case plan for Paulay. A review plan for each of them shall be filed in accordance with state and federal law until such time as adoptions are finalized.
KELLER, J.