Memorandum of Decision
This is an action by the Department of Children and Families, "DCF", to terminate the parental rights of a minor female child, Galen, born November 24, 1995. The child's likely, paternal grandfather, has been granted intervener status and seeks a transfer of guardianship of the child to him. The child's acknowledged father resist termination of his parental rights and supports his father's bid for guardianship of Galen.
A. The Female Biological Parent.
The female biological parent, herein after called Kellie B., is now nearly twenty eight years of age. She was born to an abusive, alcoholic, Vietnam-veteran with a criminal record. He died suddenly in an automobile accident when Kellie was eight years old. At the time of his death, Kellie's mother was in the hospital recovering from domestic violence injuries. The family had just been evicted from their apartment. Kellie had a stressful relationship with her mother. She left her formal education without completing the ninth grade. She has been CT Page 2867 seriously drug involved since her late teenage years; her drug of choice is heroin. She does not have a drivers license and has had sporadic employment. (Social Study, Exhibit # 2).
B. The Male Biological Parent
The person believed to be the male biological parent, who acknowledged his parentage in open court on February 17, 1998, is David F. He is thirty five years of age. He has never been married. He is the youngest of two children. His father is an ordained Christian minister who is presently sixty-seven years of age. David's mother and father separated in Venezuela where his father maintained a parish, when David was five. He was raised by his mother, mostly in Rhode Island. As far as is known, his father never remarried. David's mother apparently had twins by another man while she was separated from Reverend Robert[2]. David describes the twin half-siblings as being fathered by another man ". . . though legally they belong to his father." (Exhibit # 6). David completed high school in Rhode Island and has some post high school vocational training in car mechanics. He has worked in a variety of jobs including house painting, pipefitting, manual labor and at a local auto repair business.
David denied any substance abuse problems to DCF, when they first became involved with this case. He indicated only a modest recreational use. He refused to undergo a substance abuse evaluation at the beginning of this case in 1995. This failure to submit to a substance abuse evaluation caused a great deal of problems for David, for his father, and; ultimately, for Galen. David was much more candid fifteen months later, in March 1997, with Dr. David Mantell, the court appointed clinical psychologist. David admitted having been drunk too many times to count. His drug usage included pot, cocaine and heroin. At the time of the interview March, 1997 he admitted to having used both cocaine and heroin within the past month. He explained that they go hand in hand, ". . that cocaine gets you hyper and dope calms you down." (Exhibit # 6 p. 7)
David has a criminal history that includes, at least one, felony conviction. He permitted the court to see only a portion of his conviction record (Exhibit #1), apparently making a tactical decision that the court should only know of his arrest and convictions that have occurred since the birth of the child. This tactic was poorly adopted since the court knows from the unchallenged findings of Dr. Mantell and the representations CT Page 2868 contained in the Social Study that David's criminal history includes more than ten arrests for possession of drug paraphernalia, burglary, larceny, failure to appear charges and breach of the peace. A stipulation offered into evidence shows an incarceration of David from July 3, 1997 to February 6, 1998 for "unsatisfactory status regarding probation." This attempt by the respondent to keep the court "in the dark" as to his complete criminal history and as to the reason for his violation of probation was shallow and transparent.
C. The birth of the child, Galen
David said he had known Kellie, the child's mother, from some time in his past and that they met again in December of 1994. She immediately moved in with him and very shortly thereafter, she announced she was pregnant. David admitted that living with Kellie was a roller coaster of drugs and mood-swings. She used cocaine and heroin and he used them "to get in with Kellie." He told Dr. Mantell that by using some of their drug supply he was "taking it from her system and the baby's system by using their small supply, but this didn't work. She (Kellie) would get mad because she was not high enough and this would cause them to have fights." It was in to this chaotic environment that Galen arrived during the Thanksgiving holiday week, 1995.
The respondent's then 65 year old father, Reverend Robert, arrived in Connecticut from his adult community home in Florida to spend the Thanksgiving week-end with his four sons David, Christopher, Sean and John. He said he was here ". . to bring my four children together." Since he was staying just for a few days, he stayed at a local motel, even though he had a residence at a local religious community campgrounds. The reverend had maintained an unusually close relationship with his sons. He testified that he usually spoke to his son David, at least weekly on the phone. "He calls me and he shares with me what he wants me to know," the reverend carefully pointed out. He said that there have been an inordinate number of losses in his near and extended family, including his own loss of his mother and later his father. He describes himself as an orphan, although he was raised by his grandmother. It is clear to the court that being in a family, and being a part of a family, is very important to the reverend. His former wife has subsequently died and consequently, he now considers himself the patriarch of the family.
On this particular 1995 Thanksgiving week-end, his son David CT Page 2869 was very anxious and excited about the birth of the child to his friend Kellie. The reverend brought David to the hospital. "He was excited and he wanted me to be excited as he was, and I was," he testified. They both stayed at the hospital until the child was born and they both saw the child through the window in the maternity nursery at the hospital.
Galen was born prematurely on November 24, 1995. Hospital records indicated that shortly after the birth the child began experiencing respiratory distress and drug withdrawal symptoms. Kellie had admitted to using heroin, cocaine and marijuana during her pregnancy and in the weeks before delivery. Ten hours after birth the child was transferred to the neo-natal unit of a major Connecticut medical center. It is quite likely that the infant that was seen by David and his father through the window at the maternity unit of the hospital was not a happy, contented new-born.
 Cocaine-exposed babies show clear signs of addiction at birth. Researchers have found that babies exposed prenatally to cocaine, as to alcohol, have a lower weight at birth, are shorter, and have a smaller head. They cry, often piercingly, shake, show erratic sleep-wake cycles, have trouble feeding, and are difficult to comfort. Due to its effect of raising blood pressure and restricting blood flow to the placenta, cocaine increases complications during pregnancy including prematurity, pre-term labor, precipitous labor, and premature detachment of the placenta. Chassnoff, "Cocaine Effects in Pregnancy and the Neonate." Karr-Morse and Wiley, Ghosts from the Nursery, Atlantic Monthly Press p. 71 (1997)
David testified that many thoughts crossed his mind following the birth of the child. He recognized that Kellie was really impaired by her drug use. She wasn't a candidate for mother-of-the-year honors. They weren't married. Kellie had mentioned putting the child up for adoption. There were the costs of hospitalization — lying-in expenses. Kellie could take-off with the child and stick him with child support payments. Maybe they could get together and raise the child. Maybe the child wasn't his. It was a confusing, anxious time. He conveyed some of his anxiety and confusion to his father. The reverend wanted paternity tests.
Whether Kellie had told the hospital about David's drug use or whether she had told DCF is not clear. It is clear that within CT Page 2870 hours of birth, Kellie left the hospital against medical advise. David was asked to submit to a drug evaluation and he declined. DCF properly concluded that Kellie and David were living together in a dysfunctional relationship that included substance abuse. DCF sought and obtained an order of temporary custody of the child.
The DCF workers had a number of occasions to talk to relatives about possible placement of the child. Kellie's mother at one time offered to care for the child and adopt the child but later withdrew both offers. When the case workers talked to Reverend Robert about the situation his message was clear and unequivocal; he loves his son David, David has a home with him any time he wants. David and Galen can live with him. David and Kellie and Galen can live with him for a few months if they want. These were equations that were unacceptable to DCF. All of these offers by Reverend Robert, included David as a present or future caretaker. DCF would not agree to any arrangement that included David until he had a substance abuse evaluation. DCF believed that David had a drug problem and he wasn't being candid or cooperative. DCF made that very clear to Reverend Robert, David's father did not want to hear that. He was not receptive to the statements that his son had a drug problem.
Reverend Robert had been a minister for forty two years. He was about to embark upon retirement. He was a man of fiercely independent views in the fashion of Roger Williams, founder of the State of Rhode Island and Providence Plantations, whom Reverend Robert openly admires. He said he does not control his son. He has expressed his views to his son and his notion of individual rights and liberties. He supports his son's view that he should not be compelled to submit to a substance abuse evaluation. That is consistent with his fervently held theory of individual rights. Neither Reverend Robert nor his son elected to consider that Galen might have an individual right that need be considered in any balanced decision making. Indeed, in all the decision making made by Reverend Robert, his son's needs were considered. Galens's were not considered.
Reverend Robert is now angry at DCF. In anguished, crying and lamenting testimony, the reverend talked about how his son has a crib and a high-chair and a picture of Galen, "he's almost obsessed, he talks about the child." Reverend Robert testified, "[T]hey, (DCF) talk about the best interests of the child. We should also talk about the best interest of the father. Because CT Page 2871 of the cruelty of DCF toward him . . and toward me, I feel great neglect." And another time he said, "I wish it wasn't so academic . . . I am so frustrated that you (DCF) have not been helpful, I didn't feel that you cared, I am angry and very much involved, and I felt that they were just in the placement business. There was no sympathy or understanding."
The court finds that his anger should be self-directed. Both he and his son refused to recognize, within a time frame appropriate to the child, the seriousness of David's drug problem and to seek treatment. DCF told Reverend Robert directly that David had a drug problem. Reverend Robert made choices. His choices were always in favor of his son. While this may be considered laudable to his son, it was absolutely and unequivocally harmful to Galen, and to any chances that he may have harbored to his own efforts to care for the child. Reverend Robert's response to the direct statements of David's substance abuse by DCF was "I have been told that David had a drug problem. He was going to junior college. We have lived together between his girlfriends. I never saw a drug problem, I don't assume anything."
Reverend Robert never, unequivocally and without qualification, told DCF he would take and raise Galen. Originally, he believed that he was not involved. "They were defining the situation," he said of Kellie and David.
Initially, DCF maintained that the work of the agency was toward reunification. There was no need for a commitment by any relatives. The reverend had offered David, Kellie and Galen the use of his home if they wished. "I would offer my residence as a place for David to consider," he said. He made this very clear to DCF.
If the reverend had any failings in the early stages, it was his denial of his son's drug problem, a matter that this court finds, to be most charitable, to be incredibly naive, given Reverend Robert's vocation and life experience. His son was in his mid-thirties, unsettled, vocationally itinerant, criminally involved and living with a woman who produces a drug addicted infant. Given this scenario the reverend was not willing to accept the proposition from child protection authorities that his son, not to mention his son's girlfriend, had a drug problem. Indeed, the reverend supports his son's avoidant behavior in not getting help. If Reverend Robert wishes to assign blame, he might CT Page 2872 well look inward. His son's last best chance for personal rehabilitation and for the prospect of parental rehabilitation lay in substance abuse treatment. Neither the reverend nor his son saw the benefit.
As a consequence of his own denial and his father's support of that denial, David continued to live with Kellie for about six months. They remained drug involved. There were episodes of domestic violence and breach of the peace charges that led to their mutual arrests. Protective orders were issued. Each spent time in jail. Each avoided DCF reunification efforts. They made a few visits together to see the infant in foster care. Neither demonstrated the fervor, zeal and devotion to the child that is expected of well-motivated parents.
With respect to the fact that the respondents are the biological parents of the child, this court is mindful of the law that states that parental rights of a person based on the mere fact of reproduction give rise to constitutionally protected rights, See, e. g., Roe v. Wade. 410 U.S. 113, 152-153
(1973); Wisconsin v. Yoder, 406 U.S. 205, 231-233
(1972); Stanley v. Illinois, 405 U.S. 645, 651 (1972);Ginsberg v. New York, 390 U.S. 629. 639 (1968):Griswold v. Connecticut, 381 U.S. 479 (1965); id., at 495-496 (Goldberg J., concurring); id,; (White, J., concurring);Poe v. Ullman, 367 U.S. 497, 542-544, 549-553 (1961) (Harlan, J., dissenting); cf. Loving v. Virginia,388 U.S. 1, 12 (1967); May v. Anderson, 345 U.S. 528, 533
(1953); Skinner v. Oklahoma ex rel. Williamson,316 U.S. 535, 541 (1942). Usually, this biological connection acts as a "powerful motivating force for most parents to provide their children with continuous affectionate and responsible care. But we recognize that a child's attachments and healthy development do not rest on biology alone. They ultimately depend on the adult caretaker's reciprocal affection in day-to-day care and attention to the child's needs" Goldstein, Freud, and Solnit, Beforethe Best Interests of the Child, The Free Press (1979) p. 133-134. In cases where the biological parents have failed to discharge their responsibilities, for whatever reason, and the child has bonded to caring and nurturing foster parents, the court must begin to view the foster family as a legally recognized, autonomous unit. A real, de facto, family. Failing to recognize these psychological bonds would cause unwarranted destruction to very secure attachments producing both psychological distress and developmental harm to the child. CT Page 2873 Removal of a child would also cause great hardship and harm to the foster parents.
Child placement concepts, the need for prompt resolution and the position of foster parents in placement decision making, have been recognized by the Congress of the United States in recent legislation entitled The Adoption and Safe Families Act of 1997,42 U.S.C. § 620 et seq. This legislation, presently being implemented in Connecticut, calls for the commencement of proceedings for termination of parental rights for any child who has been in the care of the state for fifteen out of the past twenty two months, an implicit recognition that the children need a secure placement and may have developed that attachment while in foster care. (Sec. 103) The legislation also recognizes that one year in a child's life is a long time section 302 requires that a hearing be conducted within one year in a child's life or recommendations on the permanent home for the child. This requirement is a further recognition by the Congress that one year is generally a sufficient time to evaluate whether parents have restored or rehabilitated themselves to the point where they can resume a responsible position in the life of the child.
A third important feature of the new legislation gives foster parents, pre-adoptive parents, and relative caretakers the right to notice of hearings and the right to be heard. This is a recognition of the child development concept that the child may already be a de facto member of an intact family unit. (Sec. 104) It also recognizes that foster parents may know as much as anyone about what is best for the child.
In this case, the child was born on November 24, 1995. The child was placed in foster care due to the inability of the parents to properly care for the child. Both were impaired by the use of illegal substances. Neither visited consistently nor with the determination and enthusiasm one would expect of new parents. The child's biological mother suggested to the DCF worker in June, 1996, that she was thinking of having Galen adopted and that ". . she would be better off in the foster home where she was living." She last saw the child in that same month, June, 1996.
David F. visited the child until August, 1996 when he called the foster mother, asked her if she loved the child, to which she replied, yes. David stopped visiting altogether. In late November, 1996, he called DCF from prison and ask to be reunified CT Page 2874 with the child. DCF arranged a visit in early 1997. When the visit was arranged, the child robustly rejected contact with David. A psychological evaluation and parent-child evaluation was conducted in March, 1997.
Dr. David Mantel was the court appointed independent psychologist. The psychologist found David to have a strong, self-reported, history of poly-substance abuse of alcohol, cocaine and heroin. He was found to be drug dependent with Antisocial Personality Disorder. "The father's problem is seemingly intractable. He was given multiple opportunities to present for substance abuse evaluation and treatment and avoided these. It is now 15 months since his child was born and he is still abusing." Indeed, David did not undertake any substance abuse treatment until he was arrested and incarcerated for "unsatisfactory status" regarding his probation. He was incarcerated from July 3, 1997 until February 6, 1998. While in prison he has participated in substance abuse programs. When David first entered treatment, Galen was already a year and a half old.
Prior to this incarceration, Dr Mantell observed David with the child. The child reacted extremely negatively to David, crying and avoiding him. The child was neutral or friendly with Dr. Mantell, who was a veritable stranger to the child. But as to David, Galen was "person-specific" negative. "There is evidence of a conditioned, aversive relationship between the child and father. The child reacts negatively to the father's presence, his voice, and his positive overtures to her. This presents as a person-specific reaction and not as generalized stranger or male anxiety reaction."(Exhibit # 6, p. 9)
DCF filed a petition for termination of the parental rights on October 4, 1996. At that time, the infant's mother had previously suggested the child be adopted. She was last known to be an active substance abuser and had not been visiting with the child in six months. David, at the time of the filing of the petition had not been visiting in several months and, it was subsequently learned, that he was avoiding a criminal warrant, considering flight to Colorado to avoid prosecution and was still actively using drugs. Neither parent was able to care for the child; neither parent had initiated personal rehabilitative efforts.
D. The Reverend Robert, proposed guardian:
CT Page 2875
The first DCF witness testified that the Reverend Robert visited over the week-end at the hospital when Galen was born. He never contacted the worker to tell them that he wished to be considered as a placement resource; he did not contact any one initially. He voiced concerns to the hospital staff that he had provided the parents with one thousand dollars for an apartment and they hadn't used it for that purpose, and there was an issue of paternity. Reverend Robert also expressed concern at the hospital about Kellie and David's ability to be adequate parents. He told DCF that he was living in communal housing with his ministry in Florida. Reverend Robert did not come forward as an alternative for placement.
DCF worker Michelle Dwyer reported that the initial DCF plan was for reunification of the child with the parents. Her first face to face meeting with the reverend came on February 7, 1996. He told DCF that David could move to Florida and parent the child there. The DCF worker's interpretation was that Reverend Robert was in a position to facilitate his songs care of the child.
On February 8, the reverend and his son visited Galen in foster care. It was one of the two visits that the reverend had with the child. No further requests were made to that worker for Reverend Robert to visit Galen. He telephoned DCF on March 13, and complained to the DCF worker that the system was unfair to his son because of his gender and that making his son have a substance abuse evaluation was unconstitutional. He insisted that his son had a mental health problem but not a drug problem. He had not heard from his son in a long time and he was concerned about his welfare.
The reverend called DCF again on April 11, 1996 to discuss the case. He did not request a visit. He wanted his son to live with him. He alluded to retiring in July of 1996 and indicated that "that would free him up".
On July 17, 1996 Reverend Robert had a concern that his son was using drugs. He called DCF from Florida. He did not directly say he would care for the child; he said he lived in a communal setting and he questioned the paternity of Galen. He did not ask for more visits. It was during the period of the next five months that his son was keeping a low profile, avoiding his probation officer, the outstanding warrants against him and the police. Neither father nor son contacted DCF for an extended period of CT Page 2876 time. The foster parents were changing Galen's diapers, stimulating her, feeding her, cleaning her, bringing her to her medical visits and providing daily affection and nurturance. Neither David nor his father even inquired about her welfare.
In October 1996, DCF filed the petition for termination of parental rights. On May 23, 1997, the reverend appeared in court and asked for an assessment of his ability to care for Galen. In June of 1997, the reverend hired an attorney to represent him in the pending suit and was allowed to intervene for dispositional purposes. DCF made an assessment that Reverend Robert was not a suitable person because of his lack of contact for the first eighteen months of Galen's life; that he was looking out for his songs best interest not the child's, and that he had never demonstrated an understanding of child's long term needs.
Dr. David Mantell's impression, after evaluating Reverend Robert, was that he had a very general idea of taking care of the child in Florida until the natural father was able to join him and take care of the child; that the reverend was not genuinely motivated to take care of the child himself. Dr. Mantell concluded that the reverend was trying to keep alive a living relationship so the child's father could later come in and raise the child. The reverend himself wasn't even really sure the child was his grandchild. He did not present to Dr. Mantell with the profile of an involved grandparent.
Dr. Mantell did not say that the reverend could not be a competent interim caretaker, ". . that's not the issue, he has the motivation, ability and inclination to be the caretaker himself; he simply could not project a sense of confidence that this was on his agenda. He was being dutiful to offer himself as a link." The reverend had only seen the child twice; twelve months had passed. There was not a relationship between the child and this person.
Dr. Mantell cited other reasons for his conclusions. The child was born under unusual circumstances, he reported, the child had been damaged in utero, serviced by Birth to Three and moved three times. It is damaging to move a child this fragile; there is an urgency for permanency at earliest possible date to reduce the possibility of an attachment anxiety disorder. The child should not be moved unless absolutely necessary, and this could harm the child in the long term. CT Page 2877
Additionally, Dr. Mantell found that the reverend's former wife had reared the reverend's children. Reverend Robert was not a major caretaker for his own children. "The sense I have is . . . that his own biography, an active, energetic person in many social ways, but not as a day to day caretaker of an infant. He was busy out of town, and really, the obligations of the father and mother were not his responsibility."
The court concludes that the placement of a child is not an adventure in living, a risk the court should make to try out a person with no demonstrated parenting skills. Reverend Robert was, for a lot of valid reasons, unwilling to commit to raising this child very early in the decision-making process. He waited far too long to unequivocally commit himself as a placement resource.
Even to the end the reverend was concerned about the child's paternity, indicating in court testimony that he was concerned about the child inheriting from his estate. The court should not be left to imagine what would happen to Galen if the child were placed with him and subsequent genetic testing confirmed the reverend's worst fears. His willingness and motivation to care for this child would vanish. Galen's security, attachments, nurturing and custody shall not be left in such grave doubt. The reverend's offers have never been unqualified. To care for a child and raise that child requires an unbalanced, unequivocal investment of one's self that may never be rewarded. The court shares the concern of Dr. Mantell that the reverend does not project this kind of confidence in his stated goal.
II. ADJUDICATION
The court finds by clear and convincing evidence that the child has previously been adjudicated neglected (January 9, 1996) and that the parents have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, the parents could assume a responsible position in the life of the child. General Statutes 17a-112(c)(3)(B)
The court further finds that the parents have no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or CT Page 2878 reestablishment of such parent-child relationship would be detrimental to the best interest of the child; General Statutes Sec. 17a-112(c)(3)(D).
The court further finds that the parents have failed to maintain and demonstrate a consistent display of the indicia of interest, concern or responsibility for the welfare of the child that should be the hallmark of concerned parents. In reKezia M., 33 Conn. App. 12, 18, 632 A.2d 1122 (1993). The child has been abandoned by the parents in the sense that the parents have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. G.S.17a-112(c)(3)(A).
While these grounds did not exist for more than one year prior to the petition, as I required, the court finds that the requirement should be waived. The totality of the circumstances surrounding the child's birth and post-natal care and promoting the best interests of the child requires such action. The child is now developing well in foster care. The child is two years old. Neither parent can present a plan for the immediate care of the child which meets acceptable child development and child placement requirements.
III. Mandatory Findings:
The court makes the following factual findings required by17a-112(e):
1) Appropriate and timely services were provided by the Department of Children and Families, including substance abuse and individual counseling, transportation assistance, and visitation coordination.
2) The court finds by clear and convincing evidence that the Department of children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. The court finds in this proceeding that the father was unable or unwilling, earlier due to his lack of personal initiative, and due later, to his incarceration, to visit consistently or to benefit from early reunification efforts. Mother's inability or unwillingness to address her multitude of personal problems, has prevented successful reunification efforts. CT Page 2879
3) The Department, with the approval of the Court, set reasonable and realistic expectations in order to reunify the family. There was only marginal compliance or participation by the parents. The parents had failed to complete recommended treatment and programs immediately after commitment and the mother, likely, continues to be impaired by drugs.
4) The child has strong emotional ties with the foster family who has provided the physical, emotional and educational support this child needs. The child has no positive emotional ties to the biological parents or to the proposed guardian. The child has an aversive, parent-specific, negative reaction to the acknowledged father.
5) Finding regarding the age of the child. Galen is two. She has been in foster care for more than two years. She deserves a permanent, structured caring, nurturing environment that the foster parents are willing to permanently provide. Neither of the parents has offered the child a secure home at this time. The qualified offer of the Reverend Robert has been earlier discussed and rejected by this court.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions etc. The parents have not made realistic and sustained efforts to conform their conduct to acceptable parental standards. Mother requires extensive therapy to deal with her parental failings and substance abuse difficulties. While father has been incarcerated he has taken available substance abuse and parental programs offered for his personal rehabilitation. His failure to maintain a relationship with his child has displaced him as a possible parental figure. Giving them additional time would not likely bring their performance, as parents, within acceptable standards sufficient to make it in the best interests of the child to be reunited.In re Luis C. 210 Conn. 157 (1989); In reJuvenile Appeal 183 Conn. 11, 15 (1981).
7) Finding regarding the prevention of the parents from having a meaningful relationship etc.. The substance abuse, criminal behavior and dysfunctional life-style of the CT Page 2880 parents has resulted in their present situation. The reverend's early belief that the parents could be rehabilitated, coupled with his lack of geographic proximity, have contributed in some measure to his lack of a relationship with the child. If he had expressed an interest in visitation he could have had many more visits on his numerous trips to Connecticut during the past two years. The Department initially attempted to encourage contact. No unreasonable conduct is noted. The father could well have benefitted [benefited] from a drug evaluation and treatment when this child first went in to foster care. Neither he nor his father saw the benefit of such treatment, even thought it was clearly made a condition of David's rehabilitation. Their early opposition to evaluation and treatment was fatal to their case. For an infant there is an immediacy and urgency of parental response. Delay, procrastination, deferral and postponement are not accommodating words in the vocabulary of child placement decision making. When the necessary decisions had to be made, David was still drug-involved and the reverend was not unqualifyingly committed. There were too many strings attached.
IV. DISPOSITION
"Our statutes and case law make it crystal clear that the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence." In reValerie D., 223 Conn. 492, 511, 613 A.2d 478 (1992). Here the court has found that grounds exist to terminate the parents rights to the child. The court has also considered the mandatory findings and concludes from the totality of circumstances that termination of parental rights is in the child's best interest. This finding is made after considering the childs' sense of time, her need for secure and permanent environment, the relationship the child has with her foster parents and the totality of circumstances. In Re: Juvenile Appeal, (anonymous)177 Conn. 648, 667-668, 420 A.2d 875 (1979). See generally, J. GOLDSTEIN, A. FREUD AND A. SOLNIT, BEYOND THE BEST INTERESTS OF THE CHILD 99 (1979).
Order
It is accordingly, ORDERED that the parental rights of Kellie CT Page 2881 B. and David F. are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Galen. A permanency plan shall be submitted within 90 days. A review Plan for Terminated Child shall be filed in accordance with Federal Law.
Francis J. Foley, Presiding Judge, Child Protection Session