MEMORANDUM OF DECISION
This is an action dealing with the custody and parental rights of Rayshawn P., born September 26, 1997. He has been in the custody of the Department of Children and Families (hereinafter "DCF") since he was five days old, now over three years, and has been committed to DCF since December 9, 1997.
 I FACTS
The court finds the following facts and credits the following evidence, except as noted.
A. Procedural History
On September 30, 1997, the Department of Children and Families invoked CT Page 14872 an administrative 96 hour hold on behalf of Rayshawn P., who was then only four days old. On October 3, 1997, DCF sought and was granted an exparte order of temporary custody. Together with the order of temporary custody, DCF filed a petition of neglect against the mother, Nola P., and the putative father, Johnny K., alleging the child was neglected in that he was being denied proper care and attention and was being permitted to live under conditions injurious to his well being. Presenting issues were the mother's long psychiatric history along with substance abuse.
Rayshawn P. was adjudicated neglected and committed to the Commissioner of the Department of Children and Families on December 9, 1997. (McLachlan, J.) On December 9, 1998, an extension of the commitment was granted, the statutorily mandated permanency plan filed by DCF calling for termination of parental rights and adoption was approved by the court, and a finding was made by the court that reasonable efforts toward reunification were no longer appropriate in regard to the mother and the father. (Dyer, J.)
In February, 1999, the court granted a motion submitted by the attorney for the mother for appointment of a guardian ad litem on behalf of Nola P. Although there never was a finding that Nola was incompetent, the court noted on the motion that "competency is questionable per treatment workers". (Keller, J.)
Even though the permanency plan of termination was approved in December, 1998, DCF did not file a termination petition until July, 1999. At the plea hearing on the termination of parental rights petition on August 19, 1999, the court confirmed service on the mother and the father, John Doe, (by August, 1999, Johnny K. had been excluded as the father) and appointed an attorney and a guardian ad litem for the mother.
At the second extension hearing held on November 30, 1999, DCF indicated it was considering filing a new permanency plan. DCF apparently was seeking to change the permanency plan from termination of parental rights to a revocation of the commitment and transfer of guardianship to a paternal great aunt, Judy. The paternal great aunt had contacted DCF in October, 1999, offering herself as a possible placement resource. The court entered orders on that date that if strong efforts on behalf of proposed guardian to establish a relationship with Rayshawn were not made, then the court would schedule the a trial on the petition for termination of parents rights.[2]
A month after this hearing, the court was presented with an ex parte motion regarding visitation and to enjoin removal of Rayshawn from his foster home. The motion was filed by the attorney for the minor child who CT Page 14873 had concerns about taking Rayshawn from his current placement and placing him with the paternal great aunt. The motion stated that Rayshawn had been removed from his foster home on Christmas day for a seven hour period for an unsupervised visit with relatives with whom he was not familiar, and counsel was concerned that DCF would attempt to remove him from his placement without notification. She asked the court to order DCF to allow Rayshawn to remain with his foster parents until a new permanency plan was filed and approved by the court. Although there had been discussion at the extension hearing regarding a new permanency plan, DCF had never filed one. Until the time of trial, the only permanency plan ever filed with this court was for termination of parental rights and adoption.
After a judicial pretrial held on April 19, 2000, a trial was scheduled. DCF was not going to pursue its petition for termination, but instead was going to proceed on a motion to revoke the commitment and transfer guardianship to the paternal great aunt. DCF did not file its own motion to revoke and transfer guardianship until June 5, 2000, seven days before the trial was scheduled to begin. The mother had filed such a motion on April 18, 2000. The attorney for the minor child filed a petition alleging two statutory grounds for termination of Nola P.'s parents rights pursuant to General Statutes § 17a-112 (c), which, in relevant part, provides for termination if "(D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interests of the child; and (E) the mother of the child, under the age of seven years who is neglected or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of the Department of Children and Families.
A consolidated trial on the motion to revoke commitment and transfer of guardianship and the petition to terminate parental rights was continued on three separate days. The parties agreed that the attorney for the minor child would proceed with her petition for termination of parental rights first and that DCF would follow with its motion for revocation and transfer of guardianship. The mother's motion for revocation and transfer of guardianship would not be pursued.
At trial, the attorney for the minor child introduced seven documentary CT Page 14874 exhibits and the testimony of Susan D. and Mark D., the foster parents of Rayshawn, Sue Ellen C. and Michael C., the alleged pre-adoptive parents, Bruce Freedman, a licensed psychologist, and Lynn Gabbard, a representative from the Lutheran Social Services. DCF introduced three exhibits and the testimony of Lori Franceschim, a DCF social worker, Veronica Ebo, a DCF social worker, Judy H., paternal great aunt, Robert H., paternal great uncle, and Cedrica Titus, a DCF social worker. Nola P. introduced two documentary exhibits and the testimony of Mary Ann Mierzwa, court services officer at Superior Court for Juvenile Matters at Hartford, Attorney Robert Swartout, guardian ad litem for Nola P., Maggie Parrotti, a representative from Capitol Region Mental Health, and Patricia Fountain Balter, an employer of Judy H.[3] The guardian ad litem for Nola P. participated fully in the proceedings, but introduced no exhibits or testimony.
After the evidence closed, it was apparent to the court that no social studies were admitted into evidence as required by Practice Book §33-5. The court asked that a further hearing be scheduled on the admissibility of any social study. All parties by written stipulation dated August 29, 2000, agreed that all social studies filed with this court be admitted as full exhibits and they were considered by the court.[4]
B. The Mother — Nola P.
Nola P. is a forty year old African American woman. She is the oldest in a family of three. She has a younger sibling who resides in New Jersey and is allegedly pursuing a career in engineering. By the mother's own reports, she does not have a close relationship with the members of her family. She self reports to have graduated from high school but did not further her education due to her paranoid episodes. Rayshawn is her second child.
Nola has an extensive history of serious psychiatric problems, for which she has spent years in hospitals and institutions. She is maintained on a regimen of injected, powerful psychoactive medications to control her mental and emotional problems.[5] Her diagnosis includes delusional chronic schizophrenic affect disorder, bi-polar disorder accompanied with paranoid episodes. She resides in a group house, which allows her to be supervised, to receive her injections, and to receive assistance in the tasks of daily living. Nola also has a conservator who handles her money and provides her with weekly spending money.
DCF received a call from the Burgdorf Clinic in Hartford when Rayshawn was born. The concern was due to Nola's long psychiatric history with an extensive diagnosis and numerous psychiatric hospitalizations stemming CT Page 14875 from her mental health condition. In addition to her mental health status, the mother was also reported to have a history of abusing substances. At the time she gave birth to her son, she tested positive for cocaine. Given these facts, DCF invoked an administrative 96 hour hold and sought and was granted an order of temporary custody. (Teller, J.)
On December 9, 1997, Rayshawn was adjudicated neglected and was committed to the care of DCF as a neglected child. On that same date, Nola was given court ordered expectations, for which she was fairly compliant. DCF offered her extensive services to address her mental health, substance abuse and parenting issues. Those services included substance abuse and mental health treatment at Capital Region Mental Health, day treatment at The Institute of Living, therapy and housing services from My Sister's Place III, and parenting classes from Catholic Family Services. In addition, DCF provided Nola with weekly visitation with Rayshawn which was consistently attended by Nola.
In June, 1998, the court ordered Nola to be clinically evaluated by Bruce Freedman, psychologist. Freedman also performed an interactional evaluation of Nola with her son. In describing her background to Freedman, Nola listed her psychiatric hospitalizations and her history of cocaine use. When she discovered she was pregnant, she went to an inpatient drug treatment program at the University of Connecticut Medical Center.
This was not Nola's first pregnancy. She was pregnant and had her first child when she was in Connecticut Valley Hospital, where she had been in and out of during the 1970's. She admitted to Freedman that this baby had been placed and her parental rights later terminated. Child's Exh. H, 2. She wanted another baby very badly since her first son had been taken away from her and she wanted something in her life to prove to everyone that just because she had psychiatric problems, she could still have a child.
The father of Rayshawn initially was reported to be Johnny K., a man with his own set of extensive psychiatric problems and hospitalizations. Nola would sneak into to see him at Norwich State Hospital and have sex with him while she was residing at the hospital. A paternity test ordered by the court excluded Johnny K. as the father.
Freedman placed Nola's intelligence in the borderline range of mental functioning. In terms of her emotional functioning, she did not show much sensitivity to the emotions of other and seemed much more inclined to respond to situations based on her own feelings. Although she would be able to handle her child during brief visits, "[she] would not be capable CT Page 14876 of providing care or managing the various tasks of parenting along with taking care of herself" Child's Exh. H, 5. She would best function in a protected setting, where her medication could be monitored and she could receive assistance in the tasks of daily living. He concluded:
 "[Nola] showed mental and emotional disturbances, diagnosed as schizo-affective disorder. "While this was pretty well controlled through medication, she still required supported group home residence to allow her to live in the community. [Nola] would not have the stability of mental or emotional functioning, or the judgment in new or unusual circumstances, to parent a child." Child's Exh. H, 6.
On December 9, 1998, the court made a finding that it was not appropriate to continue to make reasonable efforts to reunify Rayshawn with Nola P. and Johnny K. The court approved a permanency plan of termination of parental rights and adoption after the mother's attorney informed the court that the mother was willing to have the child adopted. She later changed her mind.
Of clear benefit to Nola is her social worker, Maggie Parrotti from Capitol Region Mental Health. Parrotti has been a strong advocate of Nola's since she became Nola's social worker in July, 1999, the same month the petition to terminate Nola's parental rights was filed. Parrotti believed that Rayshawn should be with his mother and worked diligently to find a relative resource for placement for Rayshawn. It was Parrotti who, according to Veronica Ebo, DCF social worker, tracked down a relative resource and who was very motivated in seeking those resources.
The court questions Parrotti's zeal on behalf of Nola. Although the court finds her to be sincere in her interest of Nola, Parrotti was clearly advocating for the best interest of Nola, with little to no concern for the best interest of Rayshawn. At an August, 1999, meeting with Parrotti, Ebo, Nola, and two other persons from Capitol Mental Health Region, the conclusion was reached that Nola could not independently care for Rayshawn. Sometime after that meeting, Parrotti began her search for relatives that could assist Nola in caring for Rayshawn. A sister, Elaine, was contacted, but she was not willing to have full custody of Rayshawn because she was actively pursuing higher education and a career. Shortly thereafter, the aunt, Judy H., was contacted and told that Nola had a two year son that was in foster care and Parrotti was seeking any viable relative resource.
Initially, Judy H. was willing to become Rayshawn's relative care giver CT Page 14877 with the hope that Rayshawn could be reunified with his biological mother; however, after participating in visits with Nola and witnessing her lack of parenting skills, Judy realized that reunification would not be realistic. She then offered herself as a permanent placement for Rayshawn. DCF began to allow visits between Rayshawn and Judy.
On February 9, 2000, the court granted motions for a psychological evaluation on Nola, an interactional evaluation between Nola and Rayshawn, interactional evaluations on Rayshawn and his current foster parents and Rayshawn and Sue Ellen and Michael,[6] a clinical evaluation of Judy H., and an interactional of Judy H. and Rayshawn. Freedman, who performed the initial evaluation of Nola, again performed these evaluations. This evaluation indicated no substantial change in the mental capability of the mother from the first evaluation to this evaluation. Nola showed mental abilities in the range of mild mental retardation and substantial psychiatric problems that have been present since her early adolescence. These psychiatric problems are currently under good control, through a regimen of powerful, psychoactive medications which allow her to live in a protected group setting with the help of a conservator to manage her finances. "She showed negligible chances of becoming a competent caretaker for this or any other child in the future. Her lethargic manner, mediocre parenting skills, and lack of recognition of the child's feeling made her interaction with Rayshawn problematic." Child's Exh. I, 17.
Although Nola has visited regularly with Rayshawn and participated in services designed to help her improve her parenting, the interactional evaluation did not reveal any signs of a positive parent-child relationship. Rayshawn showed very limited comfort with his mother during the evaluation. She used sweets to pacify him. He was avoidant, wanting little to do with her. He repeatedly asked for "mommy" while with her, and "clearly wanted to leave the room and return to his foster mother." Id., 12. "The observed relationship was a poor quality visiting relationship only. It had the obvious problem of Rayshawn being threatened by having an adult challenge his concept of "mommy," while mother's limited parenting skills and interpersonal skills created only a limited, poor quality relationship and interaction." Id. Freedman opined the chances or future development of such a parent-child relationship were poor. Id., 19. He even went further to state: "Nola P. would not be likely ever to be able to care for a child. She would be able to visit with the child, with the supervision of other adults to assist her." Id., 19.
The court notes that all during the trial, the mother mother sat passively and showed little or no interest in the proceedings. She showed no reaction to any evidence, even that which was damaging to or critical CT Page 14878 of her.
C. Rayshawn
Rayshawn, now three years old, was placed with his current foster parents at five days old. He was born full term and was not exposed to drugs as indicated by a negative toxicology report at his birth. Although generally in good health, he is presently showing signs of autistic traits.
Freedman in his evaluation noted he is extremely active, has a good sense of humor, and has good expressive and receptive language for his age. He also has excellent gross and fine motor coordination as well. During his evaluation with Freedman, he showed some typical terrible two behaviors. He was defiant, in a playful mischievous way, and also could be distracted and re-engaged at such time. He showed a strong, independent spirit and was able to communicate his wishes.
Freedman concluded:
 "Rayshawn showed a combination of language, behavioral, and interactional symptom of childhood autism. If this symptom persisted at its present level, he would probably be best described as showing a mild case of this disorder . . . It was too early to estimate the progression or future of this problem area, although children with this type of disorder show strong need for routine, order and structure in their lives. They are able to attach themselves to people, but do so with significant difficult, showing distress when things are changed around them, or when exposed to new or unusual people or situations. Rayshawn showed signs of these types of problems during the time he was observed . . ." Child's Exh. I, 15 (emphasis added).
D. Susan D. and Mark D. — foster parents
The foster parents have been licensed since 1997 and have had approximately twenty-seven children in their care. They incorporate these children into their lives and their families as if the children were one of their own biological children. They clearly are committed to caring for these children at a level probably not often reached by most foster parents.
They picked up Rayshawn at the hospital to have him in their care when CT Page 14879 he was five days old. They introduced him to their family and friends, most notably Sue Ellen C. and Michael C., the alleged, pre-adoptive parents. Sue Ellen and Michael are close friends of Susan and Mark and have been unable to have children of their own and were considering adoption. When Susan and Mark learned from the DCF social worker that a petition was going to filed to terminate the parental rights of Rayshawn's mother, there is no doubt that they began to encourage and foster a relationship between Sue Ellen and Michael and Rayshawn. Susan in fact said that she believed that God had placed Rayshawn in their home so he could go live with Sue Ellen and Michael.[7]
The foster parents did not want to be considered as possible adoptive parents for Rayshawn. They had several of their own biological children as well as several other foster children, one of whom they were planning on adopting if parental rights were terminated. They suggested to Sue Ellen and Michael that they contact DCF and begin the licensing procedure to become certified. However, when the foster parents learned of DCF's plan for transfer of guardianship, they became quite concerned about the distress they were witnessing in Rayshawn. They both have since changed their minds, and would be willing to adopt Rayshawn if Sue Ellen and Michael could not.
The interactional with Rayshawn evidenced the foster parents were the psychological parents of the child. "He regarded them as `mommy' and `daddy', and showed strong attachment to them. Presented with other adults, he tried to rely on them for security and comfort. He was far more comfortable with each foster parent than any other adult, and showed a variety of behaviors to protect and preserve these relationships." Child's Exh. I, 16.
E. Sue Ellen C. and Michael C.
Sue Ellen and Michael first met Rayshawn when he was eight days old. They are close friends of Susan and Mark, whom they met through their church. A couple unable to have their own biological children,[8] they contacted DCF to explore the idea of becoming a licensed preadoptive home, clearly with the hope that they would adopt Rayshawn. They enrolled in the six week course, made renovations to their home in order to qualify, and submitted to background investigations. They eventually were approved as a legal risk home.[9] They understood from the beginning of their involvement that they could not be designated as future adoptive parents, however, as noted in Freedman's evaluation, "they functioned as close relatives ordinarily would for this child. They [did] this in the total absence of any biological extended family in the child's life. They were indistinguishable from biological relatives in the child's experience, and were two of the closest human beings to the child." CT Page 14880 Child's Exh. I, 18.
Rayshawn spends a good deal of time with Sue Ellen and Michael. They have provided day care for Rayshawn, some times with the knowledge of DCF and some times without. On one occasion they were allowed to provide respite care with the knowledge of DCF because the foster parents went out of town to attend a funeral.
Sue Ellen and Michael were included in the interactional evaluations ordered by this court. Freedman opined that they showed "excellent interaction and a strongly established relationship with the child" who referred to them also as "mommy" and "daddy". Id., 15. Rayshawn showed an extremely high level of comfort with them, and they were attentive and affectionate to him throughout the visit. "They could be easily mistaken by an observer to be the primary caretakers of the child. Rayshawn showed an extremely high level of comfort with them. They were attentive and affectionate to him throughout the visit." Id.[10]
F. Motion for Revocation of Commitment and Transfer of Guardianship
Nola P. and DCF have filed separate motions for revocation of commitment to DCF and for transfer of guardianship to the mother's paternal aunt, Judy H. The proposed guardian is the younger sister of Nola's father. She is fifty-six years old, married, with grown children. She lives in West Haven and is employed as a nanny to two children, now teenagers. She became aware of Rayshawn's existence when she received a phone call from Nola's sister in October of 1999, two years after his birth. She contacted DCF and offered herself as a resource for Rayshawn's placement. At that time she believed that she could assist Nola in caring for Rayshawn, but when she learned that Nola probably could never care for Rayshawn on her own, a more permanent arrangement was explored. Visitation with Rayshawn began almost immediately after she contacted DCF.
Freedman's evaluation revealed Judy has a mental functioning in the borderline range, well below average. To her favor, Freedman found her to be a remarkable person, accomplishing what she had accomplished with the I.Q. she possessed. Freedman noted that she was a person who "presented herself in an excessively positive light, while also indicating the presence of a high level of emotional distress and troubling thoughts." Child's Exh. I, 6.
Rayshawn began to have fairly regular visits with Judy. Matter of fact, Judy, on Christmas, after only visiting with Rayshawn on several occasions, was given a seven hour visit with she and some other members of his biological family.[11] Judy described her visits with Rayshawn CT Page 14881 to Freedman as going considerably well. However, Freedman witnessed Rayshawn to have limited comfort with Judy, which seemed "mostly a function of her excellent parenting skills and gently, soothing manner" and not his own comfort. Id., 13.
Judy showed signs of excellent parenting skills. However, the comfort she described as having been created through weekly or twice weekly visiting during the fall, an extended Christmas visit, and further regular visiting since then was only marginally in evidence. Id.
While Judy H. is sincere in her belief that she can provide for Rayshawn, the court did not find her to be credible. The court agrees with Freedman's evaluation that she presents herself "in a excessively positive light." For example, she spoke of her husband and his medical condition, stating to the court that he has cancer. But when presented with this fact, her husband during his testimony was quite surprised to learn of this. She professed to be able to care for a young, very active child, however she still possesses a handicap sticker because she had her knees operated several years ago. Although she professed to be able to care for Rayshawn and any of his emotional or mental difficulties, namely his possible autism, she had not idea what autism is. While the court believes she is well intentioned, Judy H.'s ability to care for Rayshawn permanency remains in doubt.
 II ADJUDICATORY TERMINATION FINDINGS
A. Reasonable Reunification Efforts
The petition for termination filed by the attorney for the minor child alleges that DCF has made reasonable efforts to reunify the child with the mother. This must be shown by clear and convincing evidence, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided that this finding is not required if the court has determined at hearing . . . that such efforts are not appropriate. General Statutes § 17a-112 (j)(1). The court made such findings on December 9, 1998. (Dyer, J.) The court does find, from the clear and convincing evidence, that reasonable reunification efforts had been made prior to the date of these findings. Nola's ability to benefit from services were limited due to her severe psychiatric conditions.
B. Statutory Grounds
Each statutory basis for termination of parental rights set out in CT Page 14882 General Statutes § 17a-112 (b) is an independent ground for termination. In re Baby Girl B., 224 Conn. 263, 618 A.2d 1, (1992). The petitioner is required to prove one or both of the grounds alleged in its petition by clear and convincing evidence.
1. No Ongoing Parent-Child Relationship — General StatutesSection 17a-112 (c)(D)
This ground alleged requires proof, by clear and convincing evidence, that there is no ongoing parent-child relationship, which means "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112 (c)(D)
This statutory definition, as it has been interpreted in case law, requires a finding that "no positive emotional aspects of the relationship survive." In re Jessica M., 217 Conn. 459, 470, 586 A.2d 597
(1991). It "is inherently ambiguous when applied to non-custodial parents who must maintain their relationship with their children through visitation." Id., 468; In re Valerie D., 223 Conn. 492, 531, 613 A.2d 748
(1992). Although the ultimate question is usually whether the child has no present memories or feelings for the natural parent, the existence of a loving relationship or a "psychological parent" relationship with one other than the natural parent does not, of itself, establish the no ongoing parent-child relationship ground for termination. In re JessicaM., supra, 217 Conn. 473-475.
Unlike the other nonconsensual grounds to terminate parental rights, the absence of a parent-child relationship is considered a "no fault" ground for termination.
To establish this ground requires the trial court to make a two-pronged determination. First, there must be a determination that no parent-child relationship exists; and second, the court must look to the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop. The absence of a parent-child relationship can be demonstrated in situations where a child has never known his or her parents so that no relationship ever developed between them, or where the child has lost that relationship so that despite its former existence, it has now been completely displaced. In reJuvenile Appeal (Anonymous), 177 Conn. 648, 670, 420 A.2d 875 (1979).
Judicial interpretation has imposed a requirement that a child have "present memories or feelings" for the parent, and "at least some aspects CT Page 14883 of these memories and feelings are positive" to overcome this ground. Inre Jessica M., supra, 217 Conn. 475; In re Juvenile Appeal (84-6),2 Conn. App. 705, 709, 483 A.2d 1101, cert. denied, 195 Conn. 801
(1984). The existence of positive feelings usually depends on the viewpoint of the child. In re Ravna M., 13 Conn. App. 23, 35, 534 A.2d 897
(1987). As the Appellate Court recently noted, "the feelings of the child are of paramount importance." In re Tabitha T., 51 Conn. App. 595, 602,722 A.2d 1232 (1999). "Feelings for the natural parent connotes feelings of a positive nature only." Id. In In re Romance M., 229 Conn. 345, 355,641 A.2d 378 (1994), the Supreme Court noted the distinction between a psychological parent and a" "a person who visits."'
The mere fact that there has been some minimal contact between the parent and the child does not preclude a determination that there is no ongoing parent-child relationship. In re Juvenile Appeal (Anonymous),
supra, 177 Conn. 638.
Clearly and convincingly the evidence has shown there is no ongoing relationship between Rayshawn P. and his mother within the statutory definition. Rayshawn has no positive memories or feelings for his mother. The only time he has seen his mother has been in a supervised setting, usually one hour a week . . . Although the interactional evaluation noted that he showed recognition of his biological mother, there was no evidence to indicate that this recognition was merely of a person who he visits with on a regular basis. During the evaluation with Nola, he continually and repeatedly asked and called out for "mommy" referring to his foster mother. Even when Nola tried to tell him, "no, I'm mommy" he gradually became more upset and tried to walk away from her, crying for "mommy".
Having found that there is no ongoing relationship, the court is required to determine whether it would be in Rayshawn's best interest to allow additional time for one to be established. The factors to be considered include "(1) the length of stay with [his] foster parents, (2) the nature of [his] relationship with [his] foster parents, (3) the degree of contact maintained with the natural parent and (4) the nature of [his] relationship with [his] natural parents." In re Savanna M.,55 Conn. App. 807, 816, 740 A.2d 484 (1999).
In considering whether to allow further time for the establishment of a parent-child relationship, the court notes the testimony of Freedman as to the critical need for permanence, and more importantly, for continuity, in the life of a three year old with autistic symptoms.
Applying these factors leads, clearly and convincingly, to the conclusion that no further time is warranted for Nola P. to establish a CT Page 14884 positive relationship with Rayshawn. Rayshawn has been living with his foster family since he was five days old, now over three years, his entire life. There he has found the nurturing and stability which every child needs. Rayshawn and Nola do not have a relationship except to the extent that he may recognize her as a person who visited him. As Freedman noted in one of his conclusions:
 "[Nola] showed a relationship with [Rayshawn], although it was a visiting relationship of poor quality. [Her] parenting skills were poor, she was passive and lethargic in her interaction with Rayshawn, and she threatened his attachment to his foster mother. This threat was both symbolic, through his exposure to a women who regularly tried to establish closeness with him, as well as verbal, since she actively argued with him that she was "mommy, ' not the foster mother. She chastised Rayshawn that he should not cry or show distress about this. Despite her having visited Rayshawn regularly, and attended parenting classes, she continued to show poor interaction with him, and he was avoidant when forced into contact with her." Child's Exh. I, 16.
Clearly and convincingly, his best interest would not be served by allowing more time for Nola P. to establish a relationship with Rayshawn nor would any amount of time appear to be sufficient for Nola to be able to perform minimal parental care giving. Freedman concluded: "Nola P. had visited regularly with Rayshawn, and had participated in services designed to help her improve her parents. This had obviously not led to the establishment of a basic, positive relationship over the past two years. The chances for future development of such a parent-child relationship were poor. Waiting longer for the relationship to improve would not be in the child's best interests." Id., 19. Parrotti and DCF apparently agreed at the August, 1999, meeting and the mother's own efforts to place the child with a relative is tacit admission of this as well.
2. Failure to Rehabilitate and Prior Rights Terminated: General Statutes 17a-112 (c)(3)(E)
The second ground alleged in this case against the mother is that:
 "the parent of a child under the age of seven years who is neglected or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that CT Page 14885 within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families." General Statutes § 17a-112 (c)(3)(E).
This ground for termination differs from the failure to rehabilitate ground, General Statutes § 17a-112 (c)(3)(B), because it does not require the prior adjudication that the child was neglected or uncared for. This ground is designed for the unfortunate common situation where a parent whose rights to one child have been terminated, subsequently, with respect to another child under the age of seven, continues to exhibit the same behavior and lack of ability to parent that led to the earlier termination.
In examining the elements of this ground as it relates to this case, first, Rayshawn is under seven years old. Second, the court has found that he was neglected as of December 9, 1997. Finally, the court finds by clear and convincing evidence that Nola had her parental rights to another child terminated. Child's Exh. G, 2; Child's Exh. H, 2; Child's Exh. I, 2; DCF Exh. A, 2-4.
The remainder of the statute tracks the language of the traditional failure to rehabilitate statute. See, General Statutes § 17a-112
(c)(3)(B). Thus it is appropriate to borrow the case law interpreting that language. This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167, 554 A.2d 722
(1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M., 49 Conn. App. 229, 240, 714 A.2d 64
(1998) (internal citation omitted). Because of the requirement that the court predict what will happen within "a reasonable time" after the filing of the termination petition, it is sensible to conclude that the court can consider not only the parent's conduct before the filing of the termination petition, but also the conduct occurring after it.
By urging transfer of guardianship, Nola acknowledges that she is not likely within a reasonable period of time to rehabilitate to the point where she could successfully parent her child. Furthermore, Freedman stated that "[she would not likely ever to be able to care for a child. She would be able to visit with the child, with the supervision of other adults to assist her." Child's Exh. I, 19. CT Page 14886
Nola's circumstances today have not changed significantly since her parental rights were terminated on her first child in 1979. She is unable to independently care for herself, she resides in a supervised living arrangement, mostly due to her mental health limitations. She relies on numerous psychotropic medications to cope with the challenges imposed by her mental health problems. Despite her extensive treatment and participation in programs that addressed her mental health problems, substance abuse and parenting skills, she has not rehabilitated herself to be able to parent her son.
Accordingly, the court finds that the minor child has proven this ground as well by clear and convincing evidence.
 III DISPOSITION
A. General Statutes Section 17a-112 (e) Criteria
The court has found by clear and convincing evidence that the two statutory grounds alleged by the petitioner for the termination of Nola's parental rights have been proven and the court has previously found that DCF made reasonable efforts to reunify and that as of December 9, 1999, such efforts were no longer appropriate. Before making a decision whether or not to terminate the respondent mother's parental rights, the court must now consider and make findings on each of the seven criteria set forth in General Statutes § 17a-112 (3). In re Romance N.,229 Conn. 345, 355, 641 A.2d 378 (1994).
These criteria and this court's findings, which have been established by clear and convincing evidence, are as follows:
(1) "The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent."
Based on the foregoing discussion, the court finds that Nola was provided with the services necessary to facilitate her reunion with Rayshawn. These included substance abuse counseling, parenting classes, visitation and case management. All of these services were relevant to the needs of the mother.
(2) "Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended." CT Page 14887
The court finds by clear and convincing evidence that DCF made reasonable efforts to promote reunification of Rayshawn with Nola. Due to her mental limitations and severe psychiatric illness, the mother was unable to benefit from the services to an extent which would allow her to successfully parent her child. In addition, the court found on December 9, 1998, that further efforts for reunification were not appropriate.
(3) "The terms of any court order entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties have fulfilled their expectations."
The court finds that reasonable court expectations were set for Nola in the neglect proceedings. Although she was in compliance with the majority of the court expectations, she has been unable to benefit from these services to the extent that she can independently care for herself or her child.
(4) "The feelings and emotional ties of the child with respect to his parents, any guardians of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional. ties."
Rayshawn has no feeling or emotional ties to his mother, and merely recognizes her as someone who visits with him. On the other hand, he shows a strong attachment to his foster parents who have provided all of his care throughout his life. He also showed a level of comfort with Sue Ellen and Michael which was very close to that observed with the foster parents and demonstrated his highest level of developmental skills and interpersonal warmth when with them. Child's Exh. H, 16.
(5) "The age of the child."
Rayshawn is three years old.
(6) "The effort the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return to his home in the foreseeable future including but not limited to (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided that the court may give weight to incidental visitations, communications or contributions and (b) the maintenance of regular contact or communications with the guardian or other custodian of the child."
As detailed above, the court finds that Nola has not made the necessary changes in her life to accommodate the care and nurturing of this child. CT Page 14888 Unfortunately this is due in large part to her severe psychiatric illness which prevents her from achieving the level of personal rehabilitation necessary to effectively provide and care for Rayshawn.
(7) "The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable acts or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
There is nothing in the records, including economic or institutional conduct or circumstances, to suggest that these parents have been prevented from maintaining or establishing a meaningful relationship with the children. Since the time of the child's removal, Nola was offered the assistance of counsel as state expense as well as a guardian ad litem. She was offered assistance and services, which, if she could have benefitted, would have promoted reunification.
B. Best Interests of the Child
The court has found that the grounds for termination of the parental rights of the biological mother have been proven by clear and convincing evidence. The court has made the seven statutory findings required, which all weigh in favor of termination being in this child's best interests. The court must now address the issue of whether the termination of parental rights is in the best interests of the child. This is part of the dispositional phase of a termination proceeding.
The court must also consider his best interests as to the issues raised by the motion to revoke commitment and the motion for transfer of guardianship. As has been held:
"The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that the cause for commitment no longer exists. Once that has been established, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests." In re Cesar G., 56 Conn. App. 289, 292-293, 742 A.2d 428
(2000).
In this case, there can be no doubt that the cause for commitment still exists. Rayshawn cannot be returned to his mother. Nola's psychiatric illness requires her to live in a setting where she can be supervised and be supported by mental health workers on a strict regimen of medications. In his testimony, Freedman opined that placing Rayshawn in such a setting could not be seriously considered and would be very dangerous to the child. Therefore, the court, after placing considerable weight on Freedman's testimony and evaluations, the court denies the CT Page 14889 motion for revocation of commitment.
Having denied the motion, the court must next consider the motion for transfer of guardianship. At issue is whether or not placement of Rayshawn with his paternal great aunt is in his best interests. The court finds that Judy H. is well meaning and cares about Rayshawn. However, her presentation is unpersuasive. The court finds from the clear and convincing evidence that she does not have a close relationship with him and is not aware of his special needs. Freedman testified that this would be a very risky placement since Rayshawn has showed some autistic like symptoms and he could end up very disturbed, very non-functioning, and the risks are too high for it to be a sensible placement.
Further, ever since Judy became aware of Rayshawn, there was no indication that her husband had visited Rayshawn except in his own home. There is also concern whether Judy at her age and with her own medical issues and level of understanding of Rayshawn's needs could care for a very active, special needs child.
DCF's position in favor of transfer of guardianship was enunciated by Cedrica Titus, the current social worker assigned to the case. It is in Rayshawn's best interest to be placed with his great aunt because he would know "where he belongs, where he comes from" and he would know his cultural heritage. But as Freedman pointed out, "it would be hard to argue that the extended family now offered important bonds of love and closeness, when in fact no single extended family member had appeared during two full years of placement" (Child's Exh. I, 18), and if not for Parrotti, the court questions whether any family member would have come forward.
 "[W]e recognize that a child's attachments and healthy development do not rest on biology alone. They ultimately depend on the adult caretaker's reciprocal affection in day-to-day care and attention to the child's needs" Goldstein, Freud, and Solnit, Before the Best Interests of the Child, The Free Press (1979) p. 133-134. In cases where the biological parents have failed to discharge their responsibilities, for whatever reason, and the child has bonded to caring and nurturing foster parents, the court must begin to view the foster family as a legally recognized, autonomous unit. A real, de facto, family. Failing to recognize these psychological bonds would cause unwarranted destruction to very secure attachments producing both psychological distress and developmental harm to the child. In re Galen F., CT Page 14890 (Conn.Sup.Ct. for Juvenile Matters, Child Protection Session, Foley, J.), 1998 Ct. Sup. 2866, March 10, 1998, aff'd, 54 Conn. App. 590, 737 A.2d 499 (1999).
"The guiding principal in determining custody is the best interests of the child . . . The best interests of the child include the child's interest in sustained growth, development, well-being, and continuity and stability of its environment." (Citations omitted; internal quotation markers omitted.) Schult v. Schult, 241 Conn. 767, 777, 699 A.2d 134
(1997); In re Shyina B., 58 Conn. App. 159, ___ A.2d ___ (2000). The court finds that placement with Judy H. is not in Rayshawn's best interests and denies the motion for transfer of custody and guardianship to her.
Next, the court must examine whether it is in the best interests of the child to terminate his mother's rights to him. The court find that Nola is not in a position now and will never be in a position to care for Rayshawn, a special needs child. "He shows signs of mild autism, with the accompanying desire for sameness and aversion to change, difficulty in establishing intimacy with other, and language difficulties. He also showed asthma and accompanying respiratory problems. Both the foster [parents and Sue Ellen and Michael] showed high levels of understanding, involvement, and commitment to addressing these special needs." Child's Exh. I, 18.
Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." See In re Juvenile Appeal,
(83-CD), 189 Conn. 276, 292, 455 A.2d 1313 (1983). In addition, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In reAlexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992).
Freedman went on to conclude:
 "Establishing a secure, permanent home for him would protect Rayshawn's future development and psychological well being. He was happy and well cared for in his foster home, although this was not a potential adoptive home. Termination of parental rights would be the correct action to allow a permanent placement to be arranged. In terms of disposition, it would be hoped that [Sue Ellen and Michael] would be given the strong preference to adopt Rayshawn. They showed the best qualification to care for the child, and his transition to their home would be comfortable and positive for him. By moving to this CT Page 14891 home, he would have nothing to lose, and much to gain." Child's Exh. I, 20.
The court concludes, from the clear and convincing evidence and testimony, that it is in the best interests of Rayshawn to have permanency and stability in his life and that it is in the best interests that his mother's rights to him be terminated. This finding is made after considering the child's sense of time, his need for secure and permanent environment, the relationship the child has with his foster parents and the totality of the circumstances. In re Juvenile Appeal. (Anonymous),177 Conn. 648, 668-668, 420 A.2d 875 (1979).
The court therefore orders that a termination of parental rights enter with respect to Nola P. Sue Ellen and Michael have expressed a desire to adopt Rayshawn and the court directs that they be given first consideration in any adoption. The court pursuant to General Statutes § 17a-112 (h), appoints the Lutheran Family Social Services as the statutory parent. The court further orders that a plan for Rayshawn and a review plan for him be filed in accordance with state and federal law.[12]
Swienton, J.