## IN RE SAMANTHA B.*

Superior Court
Juvenile Matters

Memorandum filed December 26, 1997

BRENNEMAN, J. On April 30, 1997, twenty-seven month old Samantha B., who had spent none of her life with either of her biological parents, became the subject of this petition by which her legal guardian, the department of children and families (DCF), seeks to terminate the parental rights of Evelyn M. and Jason B., her mother and acknowledged father, so that she could secure a permanent home through adoption. The sole ground alleged for terminating the mother's parental rights[1] was her failure to achieve rehabilitation within the meaning of General Statutes § 17a-112 (c) (3) (B), which provides in relevant part: "[T]he parent of a child who has been found by the Superior Court to have been

---

* Thus entitled in accordance with the spirit and intent of General Statutes § 46b-124 and Practice Book § 35-5.

[1] Nonconsensual grounds pleaded as to the father were subsequently withdrawn prior to trial when his consent was found by the court to be a valid ground for terminating his parental rights.

neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

The initial hearing was not scheduled in the court location at which it was filed until June 17, 1997, notwithstanding the applicable statutory requirement that "the time for hearing shall be not more than thirty days after the filing of the petition." General Statutes § 45a-716 (a), incorporated by reference into § 17a-112 (c) for all cases concerning children previously committed to DCF as neglected or uncared for under General Statutes § 46b-129 (d). As in the time parameters for filing petitions to extend commitments ninety days prior to the expiration of such commitments, the "shall" in § 45a-716 (a) is deemed directory rather than mandatory, under the reasoning of *In re Adrien C.*, 9 Conn. App. 506, 510–12, 519 A.2d 1241, cert. denied, 203 Conn. 802, 522 A.2d 292 (1987). The mother's failure to object to this late scheduling of the initial hearing thus constitutes a waiver of any right she might have had to do so. Id., 511–12.

Two months after the initial hearing, the petitioner's oral motion to amend to add consent as grounds for terminating the father's parental rights was granted by agreement, and the court, after canvassing Jason, found his consent, having been made voluntarily, knowingly and with the advice of counsel, to be a valid ground for terminating his parental rights. The allegation of Evelyn's failure to achieve rehabilitation as grounds for terminating her parental rights, so as to free the child for adoption, remained contested and was transferred for trial to the Child Protection Session of the Superior Court at Middletown.

At the outset of the initial trial date of October 14, 1997, the court found the mother competent to participate in the trial on the basis of an evaluation performed by psychiatrist Richard Sadler. On that date, and on a final date two weeks later, the mother appeared, represented by the same attorney who had represented her since DCF first took custody of Samantha shortly after her birth.

At the conclusion of trial, closing arguments were made on the record in lieu of counsel's submitting written trial memoranda. The adjudicatory date is thus April 30, 1997, the date the petition was filed under Practice Book § 1042.1 (4), now § 33-3;[2] the dispositional date is October 28, 1997, the same date on which decision was reserved.

## FACTS

Evidence offered at trial interpreted in the light of the prior record in this court concerning Samantha and judicial notice taken of all court actions affecting her that preceded initiation of this action, support the following findings of fact: Samantha was conceived one month after her acknowledged father, Jason, was arrested for risk of injury to a child on the basis of allegations of sexual abuse of several children. He subsequently was convicted and sentenced to probation until January 3, 2000, conditioned on his having no unsupervised contact with any child under the age of sixteen. Samantha was born on January 20, 1995, at twenty-six weeks gestation, weighing approximately twenty ounces. She remained in hospitals with a variety of respiratory and eating difficulties until she stabilized

---

[2] The petitioner's oral motion of August 8, 1997, to amend the petition as to the father to add consent as a ground to terminate his parental rights is not regarded as a substantive amendment in any way affecting the sole ground originally pleaded as to the mother so as to move the adjudicatory date from April 30 to August 8 pursuant to the cited rules of practice.

sufficiently to be placed in a specialized foster home on September 2, 1995, where she has remained until the present.

A referral was made to DCF when the infant was only three weeks old because of concerns of hospital staff about the mother's ability to care for the child based on their observations of her intellectual limitations, and her plan to take the baby to live in the home where she then lived with her mother and brothers, one of whom, she reported, was retarded and had physically abused her in the past. Evelyn also expressed her disbelief that Jason had committed the acts for which he was convicted, did not believe he would present any risk of danger to Samantha in the future, and planned to marry him and make a home with him for the baby. In late March, hospital staff complained to DCF that Evelyn repeatedly overstimulated this fragile baby, causing "severe distress." Overstimulation increased her difficulty breathing, causing her to turn blue. The staff nurse was concerned when Evelyn asked her, "Does she stand on her head, because her father does that?" She did not appear to understand how difficult it was to get nutrition into Samantha or to avoid temporary asphyxiation, claiming that she knew how to care for children because of having taken care of nephews and nieces. She became increasingly agitated when told that DCF would be seeking temporary custody, and after she told a DCF social worker that she would "rather see her daughter dead than in foster care" and that she "meant it," hospital staff requested that DCF obtain temporary custody because the hospital could not provide constant supervision during parental visits. On April 19, DCF obtained a ninety-six hour administrative hold so that the agency could ensure supervision during all such visits, and the next day filed a neglect petition with the Superior Court and obtained an order of temporary custody. Following a contested hearing

on June 5 on the necessity for an order of temporary custody under these circumstances; see *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 289, 455 A.2d 1313 (1983); the court confirmed the order, enabling the child to be placed directly in a specialized foster home when ready to leave the hospital three months later. On January 29, 1996, following receipt of a psychological evaluation conducted by Robert Meier, a psychologist, the parents entered nolo pleas to the allegation that the child was uncared for in the sense of having specialized needs that could not be met in the parental homes because of the inability or unavailability of both parents to meet the extraordinarily specialized physical and developmental needs of this premature baby. The court also found the child to have been neglected by the mother for failing to provide her with proper care and attention. The factual basis for this finding does not appear in the voluminous pleading inaccurately captioned a "Summary of Facts," being neither presented in summary form nor confined to factual statements but rather appearing to be the social worker's chronological narrative of every contact with parents, other relatives and hospital staff from the first referral in February to the filing of the petition on April 20. The only well pleaded facts on which a finding of neglect could be based following the mother's nolo plea would be the repeated incidents, despite reiterated cautions from hospital staff, of overstimulating the baby during visits, resulting in her increased difficulties in breathing.

Following this adjudication in January, the matter was further continued as to dispositional issues until March 13, 1996—nearly twelve months after DCF secured temporary custody—when Samantha was committed to DCF for an initial period of twelve months. Separate written expectations were spelled out by the court as a guide to improving the chance for each parent "to regain guardianship of your child permanently" and

containing the warning: "Failure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption." The expectations for the parents were identical with one exception. Both were required to keep appointments with DCF, to visit as often as permitted, to engage in both parenting and individual counseling and to secure adequate housing and income. In addition, Evelyn was expected to "cooperate and follow the recommendations of Samantha's health care providers" while Jason was "to comply fully with the terms and conditions of his probation." Although both parents were present at the hearing where these expectations were articulated, neither they nor their attorneys signed the list indicating their understanding thereof. A timely filed petition to extend Samantha's commitment was scheduled to be heard on March 4, 1997, but a continuance was requested by the mother's counsel. Because the continued date was after the expiration of the original twelve month commitment, the court continued the child's commitment nisi pending further hearing thereon. On the continuance date, however, neither mother's attorney nor her guardian ad litem were able to attend, but both agreed to continuing the commitment pending a case status conference on the extension. One month before that conference, set for May 29, 1997, could be convened, however, DCF had filed the present termination petition. At the initial hearing thereon, the case was referred directly to the Child Protection Session in Middletown for trial for extension of commitment and for termination of parental rights.

In the two years between the assumption of custody by DCF and the date this petition was filed, no perceptible change in Evelyn's circumstances have taken place. She continues to live with her mother and brothers, including the one with whom she had had physical

altercations. She continues to be unemployed, supported by city welfare. She participated in a psychiatric evaluation recommended by Meier, but did not follow through with the further testing recommended by the psychiatrist. She has received parenting training, but demonstrates minimal progress in understanding the highly specialized needs of Samantha who, at two, while less fragile than she was in infancy, still requires an extraordinary degree of responsiveness and care.

The mother has consistently maintained the permitted schedule of supervised visitation, but has not demonstrated a sufficient understanding of the child's special medical and development needs to be entrusted with her care, even momentarily, without supervision. Initially, the visits took place weekly at the DCF office. Later, visits took place at the Smith-Bent Agency where, despite repeated instruction, she continued to handle the child too roughly for Samantha's developmental level. Once she tried to make the baby crawl, another time she insisted that the baby could speak in full sentences, another time she reported that the baby could change the color of her eyes at will, and she repeatedly misused a toy car that could have injured the baby's legs. Smith-Bent Agency discontinued supervising visits in March of 1997, after an episode when Evelyn, despite repeated protests, insisted on ascending a stairway holding Samantha in one arm and risking a head injury. When told to relinquish the child, she continued to grasp her in one arm while descending the stairway.

Other assistance was offered but brought no improvement in Evelyn's ability to provide Samantha with an appropriate and safe home. She was referred to a parent aide but was rejected as being "unready" for such services. She was given a list of subsidized housing apartments but was rejected because of her poor credit history and also because she had no motivation to leave

her mother's home, despite the history of domestic violence there. She also insisted that she could not live alone anywhere because she was subject to periodic blackouts but did not pursue recommended evaluation or treatment for this condition. She was notified of and attended all nonemergency medical appointments but appeared to show no more understanding of Samantha's continuing developmental problems than she had two years earlier. While Samantha no longer requires a feeding tube, she remains difficult to feed, often choking and requiring the paramedical skills of her foster mother. At the age of two she does not walk or talk. Evelyn also faithfully attended appointments with the physical and occupational therapists, but they objected to her continually interfering with their attempts to work with the child, rather than observing as she was requested to do.

As the visits continued, Samantha became increasingly distressed in her mother's presence, engaging in "very atypical behavior," according to Mary White, Samantha's Early Connections teacher. She would pull at her clothes, act fidgety, and was reluctant to play with toys or accomplish the tasks set for her by the teacher. As a result, White recommended in a letter dated May 15, 1997, that Evelyn should no longer visit during sessions with the teacher. Kathleen Smith, the licensed clinical social worker who observed mother-child interactions between December, 1995, and March, 1997, concluded that even under supervision, the mother was incapable of keeping the child safe. For example, when Samantha was an infant, despite repeated instruction, Evelyn could not remember to support the child's head. Later, when that was no longer a problem and Samantha began to crawl and pull herself up, despite repeated instruction, Evelyn would pick her up by jerking at her arms and insisted on carrying her on one arm.

The foster mother, a paramedic, testified that the child continues to have difficulty eating and is prone to choking, which requires immediate appropriate paramedical intervention. If Samantha was free to be adopted, she would like to be the adoptive parent.

Testifying on her own behalf, Evelyn insisted that she could meet all of Samantha's needs, but offered no evidence in corroboration.

## FINDINGS

The facts found constitute clear and convincing proof of the following: (1) DCF made all reasonable efforts to reunify Samantha with her mother, but Evelyn appears to be not unwilling but incapable of benefiting from reunification efforts.

(2) Termination of her mother's parental rights is necessary to secure the best interests of this child so that she may be adopted by the foster mother who has demonstrated for two years her ability to meet the special medical, educational and developmental needs that this child has and may be predicted to have for a long time, considering the extraordinarily fragile condition in which she entered the world as a one pound, six months gestation infant.

(3) Over an extended period of time, starting with the child's first eight months of life spent in hospitals, and then for the next two years in foster care, despite repeated efforts by a large number of professionals, Evelyn "has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child . . . [she] could assume a responsible position in the life of the child." Evelyn appears to have done all that she was capable of doing in keeping appointments and visits and attending meetings, but the ultimate test of failure to rehabilitate is not whether a parent has

gone through the motions of meeting court and agency expectations, but rather whether such compliance has made her more capable of providing adequately for her child on the adjudicatory date (here, April 30, 1997) than she was when her child was placed in DCF custody. The evidence here is overwhelming that Evelyn is no more capable on the adjudicatory date than she was in March of 1996, when her daughter was committed, or than she was in April of 1995, when DCF first assumed custody, or in February of 1995, when the hospital first referred the family to DCF because of Evelyn's apparent inability to learn appropriate caretaking of this very fragile baby. The record is devoid of any evidence that her abilities on the adjudicatory date were significantly improved. Terminating a parent's rights is not ordered to punish a parent who has not tried to rehabilitate; it is ordered so as not to punish a child by denying her a safe permanent home with proven competent caretakers because her biological mother has tried hard but continues to be incapable of providing such a home for her. Evelyn may well be able to care for children of normal physical and developmental abilities but the basis of this adjudication is her "rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation [is] foreseeable 'within a reasonable time.'" *In re Luis C.*, 210 Conn. 157, 167, 554 A.2d 722 (1989); *In re Christina V.*, 38 Conn. App. 214, 221, 660 A.2d 863 (1995).

## MANDATORY FINDINGS

Before a court may order termination of a parent's rights, it must consider the seven factors enumerated in subsection (e) of § 17a-112:

(1) DCF offered all appropriate services to Evelyn to prepare her for assuming care of her daughter. She was provided with regular visitation, invited to medical appointments, permitted to be present at sessions with

physical and occupational therapists. Were Samantha's problems less complex, or were Evelyn more psychologically and intellectually capable of learning to meet the child's special needs, adherence to these schedules of visits and appointments should have been more than adequate to prepare the family for being united. But the child's problems are enormously complex and continuing, and Evelyn, despite her presumably best efforts, appears to be incapable of learning and putting into practice the specialized care that the child requires.

(2) DCF made reasonable efforts to reunite mother and child. Evelyn was accorded a high degree of access to the child at weekly visits and at medical and therapy appointments. DCF also tried to secure a more appropriate living situation for Evelyn, but she either would not or could not pursue such referrals.

(3) While not orders, and while not signed by Evelyn or her attorney, the court's expectations were largely complied with. Evelyn did cooperate with a psychiatric evaluation, although she did not follow through with the recommendations of the psychiatrist that she undergo further testing because medication might render her more capable of understanding her child's needs and learning how to meet them. No evidence was offered that such medication was indicated or could have effected sufficient change in Evelyn to enable her to assume the child's care in a reasonable time.

(4) No clinical evaluation of the relationship between Samantha and her mother or between Samantha and her foster mother was conducted. Testimony of the teacher and the clinical social worker, both of whom observed visits over a period of time, permits an inference that contact with the mother is a source of anxiety for Samantha, while the presence of the foster mother is a source of comfort.

(5) Samantha is almost three years old, although, because of her extreme prematurity, she is developmentally more like a two year old. She has spent her entire life, outside of the hospital in which she was born, with a single caretaker who is committed to her for life and who has demonstrated her ability to meet her needs. Foster care should be a strictly time-limited interval in the life of any child. The Federal Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 et seq., as amended, envisages that after twelve months in foster care a child deserves a permanent home. Samantha has been in foster care for twenty-two months. She deserves a permanent home without further delay.

(6) Evelyn has made consistent efforts to change her circumstances to make it in Samantha's best interests to be placed in her care. Whether these efforts consisted of more than merely keeping appointments is not apparent from this record. Whether she has made sincere efforts, within her ability, or whether she has merely gone through the motions, the ultimate test is whether she, in fact, has changed her "circumstances, conduct or conditions" sufficiently to make it in the best interests of the child to be placed with her. All of the witnesses called by the petitioner were clear in their conclusions that no such change has taken place. No professional witnesses were called by the respondent to refute such testimony.

(7) Nothing has prevented Evelyn from maintaining a meaningful relationship with the child. Evelyn was not living with her mother and brothers because of her economic condition, but because she did not feel capable of living on her own. Her visits were frequent (weekly) and regular. The lack of a meaningful relationship is not due to any unreasonable interference by DCF but rather to Evelyn's own deficits that made her

reactions to and interactions with her daughter inappropriate from the time of the child's birth to the dispositional date of October 28, 1997.

## ORDERS

Based on the findings that have been made by clear and convincing evidence and considering the seven factors enumerated in the previous section, it is ordered that the parental rights of Jason, his consent having been accepted by the court on August 8, 1997, and of Evelyn, because of her failure to achieve rehabilitation within the meaning of § 17a-112, be and hereby are terminated, and that the commissioner of DCF is hereby appointed statutory parent for the purpose of placing the child in adoption. To ensure the timely achievement of this end, the commissioner is further ordered to submit to this court within ninety days of the date of this memorandum a written report as to the progress toward such adoption. If adoption is not finalized within one year from the date of this memorandum, such commissioner is further ordered to submit a motion for review of terminated child no later than January 15, 1999, to be docketed and heard no later than one year following submission of the ninety day report.[3]

---

[3] Note on the extension petition: Because the parents' rights are terminated by these orders, there is no need at this time to act further on the petition seeking extension of Samantha's commitment which was granted nisi on March 14, 1997. In the event that an appeal is taken from this judgment, it is ordered that the child's commitment be extended until final resolution of such appeal. If the petitioner should prevail on appeal, no further petitions to extend commitment need be filed, although Motions to Review Plans for Terminated Child must be filed every twelve months until adoption is finalized. If the respondent should prevail upon such appeal and this order of commitment reversed or remanded, the commitment shall be deemed to be extended for a period of ninety days following the decision on appeal, with the commissioner ordered to submit a further petition to extend commitment immediately thereafter, to be heard and acted upon before expiration of those ninety days.