MEMORANDUM OF DECISION
On November 9, 2000, the Department of Children and Families (hereinafter, "DCF") sought temporary custody of Tatiana L., an infant child, and filed coterminous neglect and uncared for and termination petitions to have her adjudicated neglected and uncared for and to terminate the parental rights of Michelle L. and Dwight H., the biological mother and father.[2] The court granted an ex parte temporary custody order which was sustained after a preliminary hearing on November 17, 2000. Michelle L. contested the amended coterminous petitions at a trial held on October 4 and 5, 2001. After the trial commenced, Dwight H. consented to the termination of his parental rights.
The neglect and uncared for petition, as amended, alleges that Tatiana, as of the adjudicatory date, November 9, 2000, was being denied proper care and attention physically, educationally, emotionally or morally and was being permitted to live under conditions, circumstances or association injurious to her well-being. This petition further alleges that Tatiana is homeless and that her home cannot provide the specialized care which her physical, emotional or mental condition of the child requires.
The termination petition alleges Tatiana is a child under the age of seven years who is neglected or uncared for, and that her mother, Michelle, is unable or unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, Michelle could assume a responsible position in the life of the child and that Michelle's parental rights to another child were previously terminated pursuant to a petition filed by DCF. General Statutes § 17a-112 (j) (3)(E). After the court canvassed and accepted Dwight's consent to the termination of his parental rights, DCF was permitted to amend, on oral motion, its petition to allege the consent and withdraw the nonconsensual ground alleged as to Dwight.
The court finds that there is no action pending in any other court affecting Tatiana's custody and that the court has jurisdiction of this matter.
For the reasons stated below, the court grants the petition for the termination of Michelle and Dwight's parental rights.
 I
CT Page 14426 FACTUAL FINDINGS
A. Mother, Michelle L.
Michelle was born on November 17, 1968 in Windsor, North Carolina Her father has been described as an abusive and violent father and husband. He was shot and killed when Michelle was an infant. Michelle was raised by her mother in a housing project in Middletown. She has only sporadic contact with her three siblings.
Michelle had a chaotic and difficult childhood and is reported to have been defiant and unable to interact well with peers. Michelle's mother placed her with DCF when she was fourteen, but she returned home at seventeen, and soon left to be on her own.
Michelle became involved with Dwight H. at age 17 and gave birth to her first child, Darnell, in 1986. She continued to be involved with Dwight and gave birth to her second child, Yvette, in 1987. Michelle's relationship with Dwight was very unstable, marked by incidents of domestic violence and substance abuse. In 1989, she gave birth to her third child, Dorell, by another man named Darell H. Parental rights to these three children were terminated in 1997. In 1998, she gave birth to her second daughter, Moesha, but this child's paternity could never be ascertained. Parental rights to Moesha were terminated in 2000.
Michelle has never been married and has no history of employment. She has led a transient lifestyle and has a lengthy history of substance abuse and an extensive criminal history dating back to 1994. Her criminal record includes six convictions for violation of probation, three for risk of injury and breach of the peace, two for failure to appear and assault, and single convictions for burglary, criminal contempt, interfering and threatening.
B. Darnell H., Yvette H. and Darell L.
These three children came into the care of DCF on several occasions prior to May of 1994, when they were removed from Michelle's care after she left them in the care of a known drug dealer, who informed DCF. These children were adjudicated neglected and uncared for and were first committed to the custody and care of DCF on September 30, 1994. Darnell, Michelle's first child, was born in 1986, when she was seventeen. Yvette, her second child, was born two years later. Darnell was a premature baby, born after only twenty-nine weeks of gestation and was hydrocephalic, a condition which impairs brain function. He required special education and suffered from gross motor delays requiring CT Page 14427 neurological treatment. When Darnell was only a few months old, a pediatric social worker expressed concerns about Darnell's medical problems and Michelle's intellectual limitations, defensiveness and impulsiveness. A pediatric resident subsequently submitted an affidavit that Michelle failed to keep important medical appointments for the child. This physician felt Michelle had a limited understanding of the boy's health needs.
After giving birth to Yvette, Michelle considered giving her up for adoption, but changed her mind. When Yvette was an infant, Michelle would wrap her in blankets and keep her face concealed, never touching her except to hold her in her blankets. She refused to interact with her daughter. In October of 1987, Michelle told a social worker that she sometimes forgot she had a second child. By the time of her final removal in 1994, Yvette displayed significant problems with oppositional behavior and an inability to follow any rules. She also required special education due to extreme acting-out behavior. She endured eleven placements before her parents' rights were terminated.
Dorell was born on January 1989. After his birth, Michelle became overwhelmed by the care of three children and requested that the oldest, Darnell, be placed in foster care, but he eventually was returned home.
The history of DCF's involvement with Michelle and her three oldest children reveals the faultiness of past child protection policies that focused primarily on family preservation. Fortunately, in 1997, controlling policy was changed to one that makes the health and safety of children the paramount concern. The Adoption and Safe Families Act,42 U.S.C. § 671 (a) (15) (A); General Statutes § 17a-15 (a).
Darnell, Yvette and Dorell first came to the attention of DCF on December 18, 1993 when the East Hartford police found all three children home alone. Although a 96-hour hold was invoked, the children were returned to their mother only four days later, despite her arrest on charges of risk of injury to a minor for her conduct. On February 23, 1994, there was a second referral from the East Hartford police because the children had been left alone again. Michelle was arrested for breach of peace, risk of injury and possession of marijuana and cocaine. Again, the children were only in foster care for four days before being returned to their mother. Finally, on May 4, 1994, when Michelle left the children alone once again with a known drug dealer who could not care for them, they began a stay in foster care that culminated with the termination of their parents' rights on November 17, 1997. See In re Darnell H., In reYvette H., In re Dorell L., Superior Court, Child Protection Session At Middletown (November 17, 1997). CT Page 14428
DCF offered Michelle many services during the years of its involvement with Darnell, Yvette and Dorell. These included parenting education, substance abuse treatment at Blue Hills Hospital and the Rushford Center, a literacy program, a parent aide in the home, job training, family and individual counseling. Except for the job training program, Michelle refused to participate in any of the above services. She failed to keep her whereabouts known to DCF and only visited with the children while incarcerated from November 1996 to July 1997. Once she was released from incarceration, she avoided DCF and did not visit her children. She did not attend the trial that resulted in the termination of her parental rights.
Judge Barbara Quinn's memorandum of decision terminating Michelle's rights to Darnell, Yvette and Dorell, at page ten, cites the opinion of psychologist David Mantell as to Michelle's parenting capacity. Dr. Mantell evaluated Michelle in July of 1994 and again in April of 1997. Upon evaluation in 1994, he found:
 . . . the mother presents as a psychosocially inadequate person of probably limited to inadequate intellectual capacity and disturbed psychological condition. . . . The mother shows signs of emotion and intellectual impairments and probably has highly problematic habits as well as a strong temper.
In April of 1997, after meeting with Michelle and her children again, Mantell found her unchanged. He noted, "The mother presented as a strongly intellectual[ly] and emotionally limited person . . . She is embarrassed and frightened because of her illiteracy and is sometimes avoidant and depressed. The impression is of functional retardation with minimal insight and judgment." Mantell testified that Michelle "showed no new insights, no additional appreciation of the impact of her former life on the children and was self preoccupied. Her lack of problem consciousness and her treatment needs indicated poor prospects for rehabilitation."
Mantell found that Darnell, Yvette and Dorell showed "signs of social and emotional neglect and disturbance, development delay, inadequate stimulation," and "attenuated bonding with the mother." All three children appeared to be "emotionally unnurtured. None of the children seemed to understand personal attention. All were strikingly needy and gregarious." In re Darnell H., et al, supra, pp. 11-12. Mantell felt that termination of parental rights would be in their best interests. Michelle's rights were terminated due to there being no ongoing parent-child relationship and her failure to rehabilitate. The two boys have been adopted together. Yvette, with significant behavioral problems CT Page 14429 and learning disabilities, has spent years in residential institutions.
C. Moesha N.
Michelle gave birth to Moesha N. on July 1998. Michelle went into labor after being dragged down the stairs by her then boyfriend, whom she named as Moesha's father. However, subsequent DNA testing proved he was not the father. Michelle then named another possible father, Edwin B., who did not respond to the court process and was defaulted for failure to appear. Michelle's parental rights to Moesha were terminated by Judge Kevin McMahon. In re Moesha N., Superior Court, Judicial District of Hartford (January 27, 2000). Michelle did not attend this trial. The transcript of Judge McMahon's ruling reveals some eerie similarities. Moesha, like Tatiana, was born in July. Michelle used cocaine while pregnant with Moesha. Michelle was involved with an abusive boyfriend whom she incorrectly named as Moesha's father. Michelle rejected DCF's offered services after Moesha is removed from her care, and was incarcerated in November of 1998 until November of 1999. Upon her release, she continued to be uncooperative with DCF.
The court found three grounds for terminating Michelle's rights to Moesha: abandonment, failure to rehabilitate ground (B), and no-ongoing parent child relationship. Moesha has been adopted.
D. Tatiana L.
Tatiana was born on July 2000 in Middletown, Connecticut. She is the third child and second daughter born to Michelle and Dwight H., indicating that sometime before or during the month of November 1999, Michelle resumed this unstable and violent relationship. Tatiana had prenatal exposure to cocaine, as revealed by three positive tests for cocaine on Michelle performed at a clinic on March 8, March 28 and April 28, 2000. After Tatiana's birth, the Middlesex Hospital made a referral to DCF, but Michelle and Tatiana were discharged the day after the delivery. The hospital discharge summary states that Michelle "will be going into an inpatient drug rehabilitation center and she will be able to take her newborn infant there as well." It's not clear who referred Michelle to such a program, but she never attended one. Fearing further DCF involvement in "her business," Michelle told DCF investigator Charmaine Rouse that she left Connecticut with Tatiana and took her to Virginia, where they stayed with a relative. Michelle was planning on starting a new life. However, on October 31, 2000, she decided to return to Connecticut to reunite with her boyfriend, Walter S. because he wanted her back and she missed him S. was residing in a shelter for the homeless on October 31, but Michelle couldn't stay there. Instead, she and Tatiana went to a shelter on Barbour Street in Hartford, which they left after CT Page 14430 Michelle had an altercation with a fellow resident. Michelle and the baby next went to a shelter in East Hartford.
On November 2, 2000, Michelle visited the Manchester office of the Department of Social Services (hereinafter, DSS) and met with a social worker, Kathleen English. Michelle informed English she came to apply for cash and housing assistance. She needed food vouchers and bus tokens. English recalled prior involvement with Michelle and another child, and asked Michelle about a cut on her lip. Michelle explained she had been walking with Tatiana in a stroller on Farmington Avenue in Hartford a few days earlier and someone had snatched a gold chain off her neck and sliced her lip with a razor.
English told Michelle she would need to come back for a card once she was granted cash assistance. On November 3, English contacted the DCF Careline and made a referral due to Michelle's injury, the presence of a new baby, and her prior experience with Michelle in 1998.
On November 6, 2000, Rouse, assigned to investigate English's referral, went to the East Hartford shelter to contact Michelle, but Michelle was no longer staying there. A shelter social worker told Rouse that Michelle had left the shelter with Tatiana at two o'clock in the morning on November 2 after an incident with another resident. The shelter employee had no idea where Michelle and the baby had gone. Michelle later told Rouse that after she left the shelter, she met a "church lady" she knew on the street who gave Michelle money for one night at a room in the Travelers Inn, a motel in East Hartford.
After the first night in the motel, Michelle called up Walter S. who offered to pay for the motel room a few more days and agreed to spend a few days there with her and the baby. The day S. arrived, Michelle related that she went out with the baby to buy pampers and formula and when she returned, the motel room was full of smoke and S. was intoxicated. Admitting this was not good for the baby, Michelle said she left the motel and spent that night with an unidentified friend However, she and Tatiana returned to the motel room the next day, and found S. with two other men and a woman. There was a crack pipe on the bed, and Michelle saw one of the men hand S. a bag of crack cocaine. Michelle started to argue with S. and the other people left. She searched the room and found more crack and another pipe. Their argument became physical, and she pushed S., which she said caused him to beat her "like a dude," kicking and punching her. Michelle called 911, but couldn't speak to the dispatcher. She finally went outside and asked someone to call 911, then passed out. When Michelle came to, the police and an ambulance were there. CT Page 14431
East Hartford police officer Jose DiFranco talked to the injured Michelle, who was bleeding from the mouth. She also had a swollen eye and a lump on her forehead. Michelle gave the officer a false name for herself and Tatiana, She was shaken up and at first, uncooperative, giving DiFranco the impression she just wanted to leave. She started answering questions after the emergency personnel provided some treatment and she calmed down. Michelle told DiFranco that her argument with her boyfriend was because he thought she had fooled around with another man. She did give DiFranco sufficient information to subsequently arrest S. Michelle and the baby were transported to the hospital.
On November 7, English, at DSS, received a call from Michelle, who stated she was now staying at the Interval House, a shelter for battered women, because she had been involved in a domestic situation with the "baby's father." Michelle asked about the status of her cash assistance and English told her she had to come back to the office to get the card. When English finished talking to Michelle and learned the details of S. assault, she again called DCF and talked to Charmaine Rouse. She told Rouse Michelle was now at the Interval House. Rouse contacted Michelle there the morning of November 8. Michelle asked for a ride to the DSS office in Manchester. When Rouse picked up Michelle, she noticed Michelle had a black eye and a swollen lip. During the trip to Manchester, Michelle told Rouse what had transpired since her return to Connecticut on October 31. She also told Rouse she wasn't planning to stay at the Interval House because of the chore requirements, which she felt she couldn't do and watch her baby at the same time. She had no idea where she was going to stay next.
When Rouse, Michelle and the baby arrived at the DSS office in Manchester, Michelle's probation officer, Toby Lucier, was waiting for her with a warrant for her arrest. After Michelle was arrested, DCF invoked a 96-hour hold and brought the baby back to the DCF office until she could be placed in a licensed foster home.
On November 9, 2000, Michelle's probation was revoked and she was sentenced to two years in jail. Her anticipated release date is October 12, 2001. Although Michelle testified that she had been accepted into a group residential program known as Mother's Retreat, where she could live with the baby, on September 7, she had told Meg Michael's, Tatiana's permanency planning social worker, that her plan was to return to the East Hartford shelter upon her release.
A DCF licensed foster care provider cares for Tatiana. Although relatives in Virginia expressed an interest in caring for her, they were investigated by Virginia authorities pursuant to the Interstate Compact[3] and deemed unacceptable. They were less than CT Page 14432 cooperative in providing information on their criminal history, and the condition of their home was unsuitable.
Tatiana is physically healthy, a beautiful and engaging child. She is now 15 months old. She has exhibited some developmental delays and receives Birth to Three services to address these. She has been crying at a high-pitch level recently and exhibits some impatience, possibly symptomatic of prenatal drug exposure. An assessment of these symptoms has been sought through the St. Francis Hospital Pediatric clinic. Tatiana also suffers from eczema and needs a nebulizer for asthma. In August, Tatiana was placed in a new foster home. She and her foster family interact well and are forming a bond. Tatiana already calls her foster mother, "Mom." Her foster mother would like to adopt her.
Tatiana has visited with Michelle about once monthly at York. Michelle usually acts appropriately but Tatiana does not call her by any name. While incarcerated at York, Michelle has attended a ten week "relationship group" and a Tier 1 Substance Abuse program consisting of a mere six hours of treatment. She has exhibited inappropriate behavior that has led to solitary confinement and restrictive housing. She has received no parenting classes, literacy training or psychological or psychiatric counseling. When she is released, she will not be on probation or parole, which, unfortunately, pretty much leaves her to her own devices for drug treatment, housing and work opportunities a parole or probation office could have offered her. Her claimed acceptance at the Mother's Retreat was unsubstantiated, and a return of Tatiana to her care immediately upon her release, even in a supervised setting, would be inappropriate.
 II NEGLECT AND UNCARED FOR ADJUDICATION
The court is required to proceed in three separate stages when neglect and termination petitions are coterminously filed. The court must first determine, by a fair preponderance of the evidence, if the child has been neglected or uncared for as of the date the petition was filed or last amended. In re Juvenile Appeal (84-AB) 192 Conn. 254, 263, 471 A.2d 1380
(1984); In re Emmanuel M., 43 Conn. Sup. 108, 111, 648 A.2d 904, aff'd.35 Conn. App. 276, 648 A.2d 881, cert. denied 321 Conn. 915, 648 A.2d 151
(1994).
The court finds by a fair preponderance of the evidence that DCF has proven all of the allegations alleged in its neglect and uncared for petition. Minimally, proper care for an infant requires a reliable, stable routine, an adequate home and sufficient income to provide, at the very CT Page 14433 least, necessities such as formula and clothing. Tatiana was denied all of these by Michelle. Apparently, when Michelle was discharged from the hospital, she had an opportunity to enter a residential drug treatment program with her baby, but chose to violate her probation avoid further DCF intervention by going to Virginia to live with a cousin. Her reason for returning to Connecticut from Virginia to a homeless boyfriend, with the accompanying risk of rearrest, shows extremely poor judgment and an inability to put the needs of her baby first. At least as far as Michelle is concerned, the Virginia relatives were supportive, and Michelle recommended them as possible caretakers for Tatiana. Michelle returned to the streets of greater Hartford with no housing and no money to resume a relationship with a substance abuser. Within a week, she had walked out of three different homeless shelters, once at two o'clock in the morning, and had been physically assaulted twice in the presence of her baby. When her probation officer caught up with her at the DSS office in Manchester, Tatiana had no one to care for her.
DCF has proven, by a fair preponderance of the evidence, that on and prior to November 9, 2000, Tatiana was neglected; she was denied proper care and attention physically, emotionally, socially and morally and was being permitted, by her mother, to live under conditions, associations and circumstances injurious to her well being. When Michelle came back to the motel and found Walter S. intoxicated, she knew enough to leave. Unfortunately, she decided to return, or even more unfortunately, she felt she had nowhere else to turn.
With respect to the uncared for allegations, there is no question that Tatiana was homeless when the neglect and uncared for petition was filed. Both Michelle and her putative father, as then designated by Michelle, Walter S. were incarcerated.
"Actual incidents of abuse or neglect are not required in determining that a child is uncared for under the `specialized needs' section of the statute." In re Kelly S., 29 Conn. App. 600, 613, ___ A.2d 1161 (1992), citing In re Carl O., 10 Conn. App. 428, 435-436, 523 A.2d 1339, cert. denied, 204 Conn. 802 (1987). In the case of the infant Tatiana, a fair preponderance of the evidence has shown that the "home" provided by Michelle, such as it was, lacked the stability, structure, safety, financial security and parental judgment necessary to assure adequate and competent care for a helpless infant. The situation was totally inadequate, in light of the parents' ongoing deficiencies, to be viewed as an appropriate home for the child. In re Kelly S., supra, 606.
 III TERMINATION OF PARENTAL RIGHTS ADJUDICATION
CT Page 14434
The court next must determine whether the proof provides clear and convincing evidence that the pleaded ground exists to terminate Michelle's parental rights as of the date of the filing of the petition, November 9, 2000.
A. Reasonable Efforts Finding
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes § 17a-112 (j) (1).
DCF in its verified petition does not claim that it made reasonable efforts for reunification, but alleges that Michelle was unable or unwilling to benefit from such efforts. In this case, the court concludes that Michelle, from the clear and convincing evidence, is both unwilling and unable to benefit from reunification efforts. The court bases this on her avoidance of DCF involvement subsequent to the birth of Tatiana and the abysmal level of cooperation and effort she displayed in the past with respect to reunification efforts for her four other children. Her inability to benefit from programs and services offered by DCF and other agencies, including probation and Interval House, has been amply demonstrated by the evidence. Michelle has made little change in the lifestyle she presented to Mantell in 1997 when he found. . . . "her treatment needs indicated poor prospects for rehabilitation."
B. Failure to Rehabilitate: General Statutes § 17a-112 (j)(3)(E).
This ground for termination differs from another failure to rehabilitate ground, § 17a-112 (j)(3)(B), because it does not require a prior adjudication that the child was neglected or uncared for. "Ground E" has been designed for the unfortunately common situation where a parent whose rights to one or more children were terminated previously and the parent continues to exhibit the same behavioral patterns that led to the neglect, and subsequent loss, of the rights to the older children. Ground E is often alleged in cases where substance-abusing mothers failure to rehabilitate and successively give birth to infants exposed to cocaine. The remainder of the statute tracks the language of the traditional failure to rehabilitate statute, §17a-112 (j)(3)(B). Thus, it is appropriate to borrow the case law interpreting that language. In re Rayshawn P., 2000 Ct. Sup. 14871, 14886 (November 27, 2000). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the CT Page 14435 particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167, 554 A.2d 722
(1989). Personal rehabilitation refers to the restoration of a parent to a constructive and useful role as a parent. The court must find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life. In re Eden F., 250 Conn. 674, 706, 741 A.2d 873
(1999). Due to the requirement that the court predict what will happen within "a reasonable time" after the filing of the termination petition, it is sensible to conclude that the court can consider not only the parent's conduct before the filing of the termination petition, but also the conduct occurring after it when considering if additional time would promote reunification. In re Sarah M., 14 Conn. App. 371, 377, 562 A.2d 566
(1989); In re Amber B., 56 Conn. App. 776, 746 A.2d 222 (2000).
Based on clear and convincing evidence, the court concludes that Tatiana, born on July 29, 2000, is a child under the age of seven years, who is neglected and uncared for, and that her mother, Michelle, had her parental rights to four other children terminated as revealed by the judicially noticed records of those four cases. The court further concludes by clear and convincing evidence that Michelle, as of November 9, 2000, the adjudicatory date, was unable or unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, Michelle could assume a responsible position in the life of Tatiana. Tatiana was the second child born to Michelle known to have been exposed to cocaine. Michelle has never adequately addressed her substance abuse or behavioral problems, which are of many years duration. Even the legal loss of four other children did little to goad her into rehabilitating. In Tatiana's case, Michelle has persisted in the same type of risky, antisocial and avoidance behaviors that led to the termination of her rights to these other children. Her level of care for Tatiana spiraled downward due to a string of poor decisions, beginning with the day she and the baby were discharged from the hospital. There is no doubt that Michelle has far to go to rehabilitate to a point where the court could be confident she would be able to care for a child without risk. She testified that she had been accepted into a program known as Mother's Retreat, which would allow her to rehabilitate while residing there with Tatiana, but she offered no documentary proof of such acceptance and DCF did not support such a placement, having determined that Michelle needs to show some stability in managing her own life before a child could be again entrusted to her care. Michelle is a woman with limited insight and a persistently antisocial personality. In early November, she left two homeless shelters after incidents with other resident. She also left Interval House and the protection and services it CT Page 14436 offered her and Tatiana because she didn't like having to do chores. Given her lengthy history of rejecting services and her repeated, failed efforts at functioning in group settings, even correctional facilities, rehabilitation within the foreseeable future is highly unlikely. There is no evidence she has received any services, and thus no realistic hope that she can or will change her negative patterns of behavior within a reasonably foreseeable time. Michelle has been convicted on six different occasions for violating probation. The repeated interventions of the criminal justice system, and several lengthy periods of incarceration, have failed to assist Michelle in making positive changes and learning to manage her own life. The court agrees with DCF's argument that to allow for any further time for Michelle's rehabilitation to the role of an adequate parent would be an unwarranted experiment at Tatiana's expense.
 IV DISPOSITION
If grounds have been found to adjudicate the child neglected or uncared for and to terminate parental rights, applying the respective standards of proof the court must then consider whether the facts as of the last day of trial, establish, by clear and convincing evidence, after consideration of the factors enumerated in See. 17a-112 (k), that termination is in the child's best interest. If the court does not find that the child's best interest would be served by terminating parental rights, it must return to, and dispose of, the neglect petition. If the court does find that termination is in the child's best interest, an order will enter terminating parental rights.
A. Section 17a-112 (k) Criteria
The court has found by clear and convincing evidence that the statutory grounds alleged by the petitioner for the termination of parental rights have been proven.
Before making a decision whether or not to terminate Michelle's parental rights, as she did not consent, the court must also consider and make findings on each of the seven criteria set forth in Sec. 17a-112
(k). In re Romance M., 229 Conn. 345, 355, 641 A.2d 378 (1994). These need not be found for Dwight H. as he has consented.
These criteria and this court's findings, which have been established by clear and convincing evidence, are as follows:
(1) "The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the CT Page 14437 child with the parent."
This is a case where DCF never had a chance to offer services since Michelle went out of her way to avoid DCF immediately after Tatiana's birth. The nature and extent of DCF efforts to engage Michelle over the years have been more fully discussed at pages three through seven of this decision. In this case, DCF's efforts were thwarted thoroughly by Michelle's lack of cooperation, her deliberate violation of her probation, and her consequent incarceration, which occurred right after DCF's involvement.
Based on Michelle's history with the department in failing to accept extensive services offered to her to reunify with her four older children, and her deliberate avoidance of DCF after Tatiana's birth, which jeopardized her own liberty when she left Connecticut while on probation, DCF correctly alleged and the court has found that with respect to Tatiana, nothing had really changed since 1994: Michelle was unwilling and unable to benefit from reunification efforts.
(2) "Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended."
As noted in paragraph (1) above, Michelle was unwilling or unable to benefit from any reunification services.
(3) "The terms of any court order entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties have fulfilled their expectations."
Preliminary steps were issued by the court for Michelle at the time the court issued a temporary custody order on November 9, 2000. Since her incarceration, Michelle, a captive audience, has maintained regular contact with her child and DCF. There is no evidence she has contributed any gifts or money toward her daughter's support. An infant would probably not benefit from cards or letters. However, the court heard no evidence as to her plans for rehabilitation upon release from incarceration if the child were not immediately returned to her custody, an unacceptably risky proposal given Michelle's past performances in structured group living enviromnents. Programs she has availed herself of while incarcerated seemed only minimally capable of helping to restore her to a useful role as a parent; she has had no parenting classes, no mental health treatment, no literacy training, no significant substance abuse treatment, and no counseling to address domestic violence or anger management. CT Page 14438
(4) "The feelings and emotional ties of the child with respect to his parents, any guardians of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties."
The federal Adoption Assistance and Child Welfare Act of 1980,42 U.S.C. § 670 et. seq., as amended, mandates that after 12 months in foster care a child must have a plan for a permanent home. In reSamantha B., 45 Conn. Sup. 468, 479, 721 A.2d 1255 (1998). Foster care should be a strictly limited episode in the life of a child. Tatiana and Michelle have had visits almost every month since Michelle's incarceration. The visits have been appropriate, although DCF social worker, Meg Michaels, who observed one visit, had to steer Michelle away from discussions about Dwight H. and refocus the visit on the child. The worker observed that Tatiana does not call Michelle any particular name, and did not observe the child to have a strong bond with Michelle. Tatiana has been in her current foster home since August of this year, but she is already bonding with the foster mother, whom she calls "Mom."
(5) "The age of the child."
Tatiana was born on July 2000 and is 15 months old.
(6) "The effort the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return to his home in the foreseeable future including but not limited to (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child."
Michelle left Connecticut and violated her probation in her effort to avoid DCF involvement after Tatiana's birth in July of 2000. She left Connecticut and went to Virginia where she spent some time with relatives. Astonishingly, to reunify with her abusive, cocaine abusing paramour, Walter S., she came back to Connecticut with baby Tatiana knowing that she faced potential incarceration for failing to appear in court and violation of probation. She returned with little or no money and no place to live. Michelle made little effort to adjust her circumstances, conduct or conditions to make it in the best interest of Tatiana to be returned to her custody in the foreseeable future. Her deliberate criminal conduct is one of the major impediments to her ability to parent and resulted in a reduction in the number of visits she might have been offered. Since her incarceration, Michelle, a captive audience, has maintained regular contact with her child and DCF. There is CT Page 14439 no evidence she has contributed any gifts or money toward her daughter's support. An infant would probably not benefit from cards or letters. However, the court heard no evidence as to her plans for rehabilitation upon release from incarceration if the child were not immediately returned to her custody, an unacceptably risky proposal given Michelle's past performances in structured group living environments. Programs she has availed herself of while incarcerated seemed only minimally capable of helping to restore her to a useful role as a parent; she has had no parenting classes, no mental health treatment, no literacy training, no significant substance abuse treatment, and no counseling to address domestic violence or anger management.
(7) "The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable acts or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
There is no evidence that DCF, the father, Dwight H., or any other person prevented Michelle from having a meaningful relationship with the child. There is no evidence that economic circumstances prevented this, either. It is abundantly clear Michelle, when she wants to, knows how to appeal to a variety of social service agencies for help. It was Michelle's own poor judgment and criminal involvement interfered with maintaining a relationship with her daughter.
B. Best Interest of the Child
In determining what is an appropriate disposition in any termination case, the court must be guided by what is in the best interest of the child. The evidence has shown that Tatiana has been in foster care since she was less than three months old. The foster mother with whom she recently has been placed is willing to adopt her. Dwight H., now incarcerated, has acknowledge his limitations and unselfishly consented to the termination of his parental rights. Michelle wants the court to accept that due to her latest incarceration, which has been just 11 months in duration, she has overcome her problems and restored herself to a status where she can parent competently. However, apart from attending some relationship groups and six hours of substance abuse counseling, she could not show any participation and progress in programs which might be of more assistance in learning to remain drug-free and be a suitable parent. Michelle has yet to be tested again in an uncontrolled environment. Even in the strictly controlled environment at the York Correctional facility, she has been disciplined and restricted for disruptive behavior. In light of Michelle's past history, it is illogical to make Tatiana wait months longer to see if Michelle can make the significant progress that would be required to restore her to a CT Page 14440 constructive and useful role as a parent. In re Migdalia M.,6 Conn. App. 194, 203, 504 A.2d 532 (1986). Prior service referrals and incarcerations never served to reform Michelle. It is not likely that she will be able to care for Tatiana in the reasonably foreseeable future. By the time she might be trusted to assume a child's care, Tatiana undoubtedly will be securely attached to her committed foster mother. This child, who suffers from growth delays, asthma, and eczema, needs a sober, reliable caretaker and the stability and consistency of a permanent home. Michelle has never realized any potential as a functionally independent adult. She relies on others who aren't reliable or trustworthy. There is no history of employment or self-sufficiency on her part. For her own sake, the court hopes she is able to find appropriate educational and other supportive services to help herself upon her release from prison.
The clear and convincing evidence in this matter establishes that it is not in Tatiana's best interest to maintain any legal relationship with her biological parents. It is sadly evident that Michelle's persistent substance abuse, inability to maintain a lifestyle free from ready access to drugs, criminal activities and selection of inappropriate male partners has, as a practical matter, rendered her chronically unable to properly care for her children.
 V CONCLUSION
After due consideration of the child's sense of time, her special need for a secure and permanent environment, the relationship she has with her foster parent, and the totality of circumstances and the statutory criteria, the petition for termination of parental rights is granted and judgment may enter terminating Michelle L. and Dwight H.'s parental rights in Tatiana L. Pursuant to General Statutes § 17a-112 (m), it is ordered that the commissioner of DCF be appointed statutory parent so that Tatiana can be placed for adoption. The statutory parent will file a written report with the court on or before November 20, 2001 at 9:00 A.M. on a plan for Tatiana. Additional plans will be filed in accordance with state and federal law at least every three months until such time as adoption is finalized. A written motion to review Tatiana's plan must be filed with the court on or before September 19, 2002 at 9:00 A.M.[4]
KELLER, J.
[2] Michelle L. named two putative fathers. A genetic test determined that Dwight H. is the child's biological father. Subsequently, the petitions were amended to remove the other man named as a possible CT Page 14441 father, a Walter S. as a party.
[3] See Interstate Compact On The Placement of Children, General Statutes § 17a-175, Article III. Conditions for Placement, subsection (d).
[4] These 9:00 A.M. filing deadlines will appear on the calendar as docket matters.